STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

JULIE POWERS, in PRO PER,

       Plaintiff,                                No. 16-009848-CD

-vs-                                      Hon. Daniel A. Hathaway

CHARLES RIVER LABORATORIES
SUSAN JACKSON, individually and in her official capacity
ROBERTO ROMERO, individually and in his official capacity,

       Defendants, jointly and severally.

| | |
|---|---|
| Julie Powers | Emily M. Petroski (P63336) |
| 367 Moross Road | JACKSON LEWIS P.C. |
| Grosse Pointe Farms, MI 48236 | 2000 Town Center, Suite 1650 |
| *In Pro Per* | Southfield, MI 48075 |
| | 248-936-1900 |
| | petroske@jacksonlewis.com |
| | |
| | *Attorneys for Charles River Laboratories, Inc. and Susan Jackson* |

## CHARLES RIVER LABORATORIES, INC. AND SUSAN JACKSON'S MOTION FOR SUMMARY DISPOSITION, OR IN THE ALTERNATIVE TO COMPEL ARBITRATION

Defendants, Charles River Laboratories, Inc.[1] and Susan Jackson (hereinafter referred to individually as "Jackson" and "CRL" or collectively as the "CRL Defendants"), by and through their counsel, Jackson Lewis P.C., respectfully request that all claims of Plaintiff, Julie Powers ("Plaintiff"), be dismissed in their entirety pursuant to MCR 2.116(C)(7) for the reason that Plaintiff's claims against CRL and Jackson are time-barred.  In the alternative the CRL Defendants respectfully request that the Court enter an order compelling arbitration and

---

[1] Improperly identified in the Complaint as Charles River Laboratories.

dismissing the action.

In support of their Motion, CRL and Jackson, file and fully incorporate by reference herein, their Brief in support of this Motion. Concurrence in the relief sought in this Motion was requested of Plaintiff, but has not been given. Hence, it is necessary to bring this Motion before the Court for hearing.

WHEREFORE, the CRL Defendants respectfully request that this Court dismiss with prejudice all claims of Plaintiff Julie Powers against CRL and Jackson, in their entirety, enter judgment in favor of the CRL Defendants, and award the CRL Defendants their costs, fees and such other relief as this Court deems just and appropriate.

Respectfully submitted,

Dated: September 1, 2016                    JACKSON LEWIS P.C.

                                  BY:    /s/Emily M. Petroski_____
                                         EMILY M. PETROSKI (P63336)
                                         Attorneys for Defendants Charles River
                                         Laboratories, Inc. and Susan Jackson
                                         2000 Town Center, Suite 1650
                                         Southfield, MI 48075
                                         (248) 936-1900 - phone
                                         (248) 936-1901 – fax
                                         petroske@jacksonlewis.com

---

**PROOF OF SERVICE**

The undersigned hereby certifies that the foregoing instrument was served upon all parties in the above case at their respective addresses disclosed on the pleadings on September 1, 2016 by:

☐ Hand Delivery            X Julie Powers via U. S. Mail
☐ ECF                      ☐ FAX
X Roberto Romero via Email

_____/s/Emily Petroski_____
                Emily Petroski

---

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

JULIE POWERS, in PRO PER,

     Plaintiff,                         No. 16-009848-CD

-vs-                                 Hon. Daniel A. Hathaway

CHARLES RIVER LABORATORIES
SUSAN JACKSON, individually and in her official capacity
ROBERTO ROMERO, individually and in his official capacity,

     Defendants, jointly and severally.

| | |
|---|---|
| Julie Powers<br>367 Moross Road<br>Grosse Pointe Farms, MI 48236<br>*In Pro Per* | Emily M. Petroski (P63336)<br>JACKSON LEWIS P.C.<br>2000 Town Center, Suite 1650<br>Southfield, MI 48075<br>248-936-1900<br>petroske@jacksonlewis.com<br><br>*Attorneys for Charles River Laboratories,*<br>*Inc. and Susan Jackson* |

**BRIEF IN SUPPORT OF DEFENDANT CHARLES RIVER LABORATORIES, INC.
AND SUSAN JACKSON'S MOTION FOR SUMMARY DISPOSITION,
OR IN THE ALTERNATIVE, TO COMPEL ARBITRATION**

**I.  INTRODUCTION**

On August 5, 2016, Plaintiff filed a five count, 166 paragraph Complaint, which alleges the following causes of action: Count I: Elliott-Larsen Civil Rights Act ("ELCRA") Age Harassment Discrimination as to all Defendants; Count II: Retaliation in Violation of the ELCRA as to all Defendants; Count III: Negligence as to CRL and Ms. Jackson; Count IV: Breach of Contract as to CRL and Ms. Jackson; and Count V: Intentional Infliction of Emotional Distress as to all Defendants.  (Complaint attached as Exhibit A).

Defendants, Charles River Laboratories, Inc.[1] and Susan Jackson (hereinafter referred to individually as "CRL" and "Jackson" and collectively as the "CRL Defendants"), move to dismiss Plaintiff's claims, in their entirety, pursuant to MCR 2.116(C)(7) for the reason that all of Plaintiff's claims against them are barred by the one year contractual limitations period contained within the Mutual Agreement to Arbitrate Claims, signed by Plaintiff.

In the alternative, Plaintiff's claims against CRL and Jackson should be dismissed in light of the binding arbitration provision also set forth in the Mutual Agreement to Arbitrate Claims executed by Plaintiff.  The arbitration agreement clearly and broadly reflects the parties' understanding that arbitration is the proper and <u>exclusive</u> forum for resolving any dispute or cause of action arising out of Plaintiff's employment with CRL, including any claims against its employees or agents.  Because Michigan law strongly favors arbitration and requires that the parties to valid arbitration agreements adhere to their commitments to arbitrate employment-related disputes, the CRL Defendants respectfully request that the Court either enter an order dismissing Plaintiff's claims as untimely, or otherwise dismissing Plaintiff's claims in light of Plaintiff's agreement to arbitrate her claims.

WHEREFORE, the CRL Defendants respectfully request that this Court dismiss with prejudice all claims of Plaintiff Julie Powers against CRL and Jackson, in their entirety, enter judgment in favor of the CRL Defendants, and award the CRL Defendants their costs, fees and such other relief as this Court deems just and appropriate.

## II.  <u>STATEMENT OF FACTS</u>

### A.  Plaintiff's Employment With CRL.

CRL is a premier global provider of products and related services designed to assist its

---

[1] Improperly identified in the Complaint as Charles River Laboratories.

clients advance their drug discovery and development businesses. (See Exhibit B, Affidavit of Susan Jackson at ¶2). Plaintiff was an employee of CRL's Insourcing Solutions ("IS") business unit. *Id.* at ¶4. The IS business provides scientific, veterinary and animal husbandry professionals to its customers to assist with or to fully operate the customers' animal research programs. *Id.* at ¶5. CRL's customers include leading pharmaceutical and biotechnology companies, federal government agencies and academic institutions. Wayne State University ("University") has contracted with the National Institute of Health ("NIH") to provide staff to assist the University's Principal Investigators, who are running individual scientific research studies at the University. *Id.* at ¶6. As a client of the NIH, CRL provided employees (including Plaintiff) to the NIH at the University. *Id.*

Plaintiff began working for Pathology Associates International ("PAI"), a subsidiary of Science Applications International Corporation ("SAIC") on or about September 24, 1997, as an Administrative Assistant. *Id.* at ¶7. CRL acquired PAI on January 8, 2001, thereby becoming PAI's successor. *Id.* Indeed, Plaintiff alleges in her Complaint that "CRL has been consistently conducting business in Wayne County since 1997" and that she "was an employee of Defendant, CRL, from September 24, 1997 through February 9, 2015"). (Complaint ¶7, ¶14). On December 19, 2013, Plaintiff commenced a medical leave for "mental health reasons". (Complaint ¶50; Jackson Affidavit at ¶10). In November of 2014, almost one year after commencing her medical leave, Plaintiff claims she informed CRL, for the first time, of the alleged "work-related harassment". (Complaint ¶¶56-57). At no time after December 19, 2013 did Plaintiff return to work or perform any work for CRL. (Jackson Affidavit at ¶10). Plaintiff's employment with CRL was terminated effective February 9, 2015. (Jackson Affidavit at ¶11).

On July 21, 2015, Plaintiff filed a Charge of Discrimination wherein she alleged that she

3

believed her February 9, 2015 termination was "in retaliation for complaining of a protected

activity in violation of the Age Discrimination in Employment Act." (Exhibit C). More than one

year later, and approximately 18 months after her employment was terminated, Plaintiff filed

the instant lawsuit.

**B. Plaintiff Contractually Agreed To A One Year Limitations Period And To Arbitrate Any Disputes Or Causes Of Action Arising From Her Employment.**

On September 26, 1997, Plaintiff executed a Mutual Agreement to Arbitrate Claims "in

order to gain the benefits of a timely, impartial and cost-effective dispute resolution procedure."

A copy of the Mutual Agreement to Arbitrate Claims signed by Plaintiff is attached hereto as

Exhibit D, as well as Exhibit 2 to the Affidavit of Susan Jackson.

The last page of the Agreement required Plaintiff to print and sign her name and date the

Agreement, which provides in relevant part:

> Science Applications International Corporation ("SAIC") and the undersigned
> ("Employee") have entered into this Mutual Agreement to Arbitrate Claims (the
> "Agreement") in order to establish and gain the benefits of a timely, impartial and
> cost-effective dispute resolution procedure. ***Any reference in the Agreement to
> SAIC will also be a reference to all subsidiaries and affiliated corporations, all
> benefit plans, the benefits plans' administrators, fiduciaries, affiliates, and the
> successors and assigns of any of them.[2]***
>
> \* \* \*
>
> 1. **Claims Covered by the Agreement:** SAIC and Employee will
> settle by arbitration all statutory, contractual and/or common law
> claims or controversies ("claims") that SAIC may have against
> Employee, or that Employee may have against SAIC or any of
> its officers, directors, employees or agents in their capacity as
> such or otherwise. Claims subject to arbitration include (i)
> claims for discrimination (including, but not limited to, age,
> disability, marital status, medical condition, national origin,
> race, retaliation, sex, sexual harassment or sexual orientation);
> (ii) claims for breach of any contract or covenant (express or
> implied) (iii) claims for violation of any federal, state or other
> governmental law, statute, regulation or ordinance; and (iv) tort

---

[2] Emphasis added.

4

claims (including, but not limited to, negligent or intentional injury, defamation and termination of employment in violation of public policy).

3. **Required Notice of Claims and Statute of Limitations:** Arbitration shall be initiated by serving or mailing a written notice to the other party ***within one year of the date*** the complaining party first has knowledge of the event first giving rise to the claim. ***If the claim is not properly submitted in this time frame, all rights and claims that the complaining party has or may have had against the other party shall be waived and void, even if there is a federal or state statute of limitations which would have given the complaining party more time to pursue the claims…***[3]

9. **Voluntary Execution:** EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS CAREFULLY READ THE AGREEMENT AND UDERSTANDS ITS TERMS. EMPLOYEE AGREES THAT ALL UNDERSTANDINGS AND AGREEMENTS BETWEEN SAIC AND EMPLOYEE RELATING TO THE SUBJECTS COVERED IN THE AGREEMENT ARE CONTAINED IN IT. EMPLOYEE HAS VOLUNTARILY ENTERED INTO THE AGREEMENT WITHOUT RELIANCE ON ANY PROVISION OR REPRESENTATION BY SAIC OTHER THAN THOSE CONTAINED IN THE AGREEMENT AND HAS HAD AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, TO THE EXTENT DESIRED, BEFORE EXECUTING THE AGREEMENT.

\* \* \*

## C. Plaintiffs' Claims.

On August 5, 2016 Plaintiff filed a five count Complaint, 166 Paragraph Complaint, which alleges the following causes of action: Count I: Elliott-Larsen Civil Rights Act ("ELCRA") Age Harassment Discrimination as to all Defendants; Count II: Retaliation in Violation of the ELCRA as to all Defendants; Count III: Negligence as to CRL and Ms. Jackson; Count IV: Breach of Contract as to CRL and Ms. Jackson; and Count V: Intentional Infliction of

---

[3] Emphasis added.

Emotional Distress as to all Defendants.  (Exhibit A).

The events giving rise to Plaintiff's claims all arise out of her employment or separation from employment with CRL. (See Complaint generally).  Furthermore, Plaintiff's individual claims against Jackson are premised upon the allegations that Jackson was "an agent of CRL" "providing Equal Employment Opportunity/Affirmative Action Employer oversight to CRL". Complaint ¶ 8.

In particular, Plaintiff sets forth the following allegations:

- CRL has been consistently conducting business in Wayne County, Michigan since 1997.  *Id.* at ¶7.

- Defendant, Ms. Jackson, as an agent of CRL, is responsible for providing Equal Employment Opportunity/Affirmative Action Employer oversight to CRL employees… *Id.* at ¶8.

- Plaintiff, Ms. Powers was an employee of defendant, CRL, from September 24, 1997 through February 9, 2015... *Id.* at ¶14.

- On December 19, 2013, Ms. Powers, following the consensus recommendations issued by her healthcare providers, initiated medical leave for mental health reasons… *Id.* at ¶50.

- On November 4, 2014, Ms. Powers…revealed…the exact nature of the work-related harassment as the cause of her disability… *Id.* at ¶¶55-56.

- [O]n November 7, 2014 Ms. Powers informed Ms. Jackson as to the cause of her current medical condition, reiterating her description of the hostile work environment… *Id.* at ¶ 57.

- On February 9, 2015, Ms. Powers' clinical therapist...indicated that Ms. Powers was permanently disabled and could not return to work… *Id.* at ¶ 71.

- Ms. Powers termination…was…effective February 9, 2015.  *Id.* at ¶84.

- While employed by Defendants, Ms. Powers was subjected to Age Discrimination by Defendants and/or their agents, servants and/or employees… *Id.* at ¶104.

- Defendants, CRL and Ms. Jackson, subsequently took an adverse, retaliatory action against Ms. Powers, including, but not limited to, terminating Ms. Powers, and/or subjecting Ms. Powers to severe or

pervasive retaliatory harassment and/or intimidation by terminating her employment… *Id.* at ¶114.

### III.  STANDARD OF REVIEW

MCR 2.116(C)(7) provides for summary disposition where "[t]he claim is barred because of . . . statute of limitations[,]"  This rule not only applies to statutory limitations periods but also contractual limitations periods. *Timko v Oakwood Custom Coating, Inc*, 244 Mich App 234, 238; 625 NW2d 101 (2001). Moreover, MCR 2.116(C)(7) provides for summary disposition where "[t]he claim is barred because of . . . an agreement to arbitrate."

Under this subsection, a court must consider not only the pleadings, but also any affidavits, depositions, admissions, or other documentary evidence filed or submitted by the parties. MCR 2.116(G)(5); *Holmes v Michigan Capital Medical Ctr*, 242 Mich App 703, 706; 620 NW2d 319 (2000). *Horace v City of Pontiac*, 456 Mich 744, 749; 575 NW2d 762 (1998). If there is no factual dispute, whether a plaintiff's claim is barred under a principle set forth in MCR 2.116(C)(7) is a question of law for the court to decide. *Huron Tool & Engineering Co v Precision Consulting Servs, Inc*, 209 Mich App 365, 377; 532 NW2d 541 (1995).

### IV.  ARGUMENT

**A.  Plaintiffs' Claims Are Time-Barred As They Were Not Asserted Within The One Year Contractual Limitations Period.**

On August 5, 2016, Plaintiff filed this lawsuit alleging, amongst other things, that CRL and Jackson committed various acts of discrimination and harassment and created a hostile work environment in violation of the Elliot-Larson Civil Rights Act ("ELCRA").  Any claims, however, which Plaintiff failed to bring within one year from the date of "the event first giving rise to the claim", are time-barred by the provision in the Mutual Agreement to Arbitrate Claims, which states:

> Arbitration shall be initiated by serving or mailing a written notice to the other party within one year of the date the complaining party first has knowledge of the event first giving rise to the claim.  If the claim is not properly submitted in this time frame, all rights and claims that the complaining party has or may have had against the other party shall be waived and void, even if there is a federal or state statute of limitations which would have given the complaining party more time to pursue the claims.

Exhibit D

The Michigan Supreme Court has stated that "an unambiguous contractual provision providing for a shortened period of limitations is to be enforced as written unless the provision would violate law or public policy." *Rory v Continental Ins Co*, 473 Mich 457, 470; 703 NW2d 23 (2005).  Indeed, *Rory* and its prodigy have consistently enforced contractual limitation provisions similar to those signed by Plaintiff in this case. *See, e.g., Timko v Oakwood Custom Coating, Inc*, 244 Mich App 234, 239; 625 NW2d 101 (2001) (finding "no inherent unreasonableness" in a 180-day period of limitations); *Rory v Continental Ins Co*, 473 Mich 457, 470; 703 NW2d 23 (2005) (holding "an unambiguous contractual provision providing for a shortened period of limitations is to be enforced as written unless the provision would violate law or public policy."); *Clark v DaimlerChrysler Corp*, 268 Mich App 138, 142; 706 NW2d 471 (2005) (finding 180-day contractual; limitation period in an employment application enforceable); *Hardsy v St John Health*, 2011 Mich App LEXIS 2236, at *1 (Dec 15, 2011)[4] (upholding 180-day contractual limitation period set forth in employment application); *Dedivanaj v DaimlerChrysler Corp*, 2007 Mich App LEXIS 1650, at *1-4 (June 21, 2007 (affirming dismissal of sexual harassment and race discrimination claims filed outside the 180-day contractual limitation period); *Toolkanen v Lear Corp*, 2007 Mich App LEXIS 132, at *7 (Jan 25, 2007) (Affirming summary

---

[4] A copy of all unreported cases cited herein is attached collectively and alphabetically as Exhibit E.

disposition of ELECTA claims based on one-year contractual limitations period); *Verdichizzi v Wright & Filippis, Inc*, 2005 Mich App LEXIS 2786, at *2-5 (Nov 10, 2005) (affirming summary disposition of employment claims based on 180-day contractual limitations period); *Breitenbeck v Merillat Industries, LLC*, 2006 Mich App LEXIS 929, at *3 (April 4, 2006 (affirming summary disposition of employment claims based on 180-day contractual limitations period provided for in employment application)

In the present case, Plaintiff signed the Mutual Agreement to Arbitrate Claims. The truncated limitations period is clearly and unambiguously set forth in the Agreement. The document states in all capitalized letters that: EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS CAREFULLY READ THE AGREEMENT AND UNDERSTANDS ITS TERMS…EMPLOYEE HAS VOLUNTARILY ENTERED INTO THE AGREEMENT…AND HAS HAD AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, TO THE EXTENT DESIRED, BEFORE EXECUTING THE AGREEMENT." In addition, the contractual limitation language is clear and unambiguous. "Because there are no statutes explicitly prohibiting the contractual modification of limitations periods in the employment context, the contract provision is not contrary to law." *Clark,* 268 Mich App at 142. Moreover, "Michigan has no general policy or statutory enactment prohibiting the contractual modification of the periods of limitations provided by statute." *Id.* Accordingly, Plaintiff's agreement to a shortened period of limitations is enforceable. Therefore, because Plaintiff last performed work for CRL on or about December 19, 2013, and because her employment was terminated, effective February 9, 2015, well over a year before she filed her claims, her Complaint should be dismissed in its entirety.

**1. The One Year Contractual Limitations Provision Is Applicable to CRL and Jackson Because CRL Is PAI's Successor and Jackson Is an Employee of CRL.**

The Mutual Agreement to Arbitrate Claims expressly states that "any reference in the Agreement to SAIC will also be a reference to all subsidiaries [in this case PAI] and affiliated corporations, all benefit plans, the benefit plans' administrators, fiduciaries, affiliates, and the successors and assigns of any of them." (Exhibit D). Likewise the Agreement clearly provides that it applies to all "claims or controversies" "that Employee may have against" any "officers, directors, employees or agents in their capacity as such…" *Id*.

Indeed, the Agreement expressly identifies PAI's successors, in this case CRL, and its employees and agents as designated classes intended to benefit from the one year limitations provision. It is well established that a third-party beneficiary to a contract "stands in the shoes of the promisee and thus may enforce the contract against the promisor." *Guilder v Pontiac Osteopathic Hosp*, 2011 Mich App LEXIS 2074, at *5-7 (Nov 22, 2011), *quoting White v Taylor Distrib Co, Inc*, 289 Mich App 731, 734; 798 NW2d 354 (2010) (citation and internal quotations omitted). Furthermore, it is a fundamental rule in agency law that the principal and his or her agent share a legal identity. *Guilder*, *supra* at *6, *quoting People v Konrad*, 449 Mich 263, 280-281; 536 NW2d 517 (1995); *see also Persinger v Holst*, 248 Mich App 499, 505; 639 NW2d 594 (2001).

In this case, Plaintiff alleges that Jackson was an employee and/or agent of CRL. The Mutual Agreement to Arbitrate unambiguously provides that the one year limitations period applies to "employees and agents." Because the Agreement expressly identifies successors and their employees and agents as designated classes intended to benefit from the one year limitations provision, any claims filed against CRL or Jackson outside of the one year limitations period are barred as a matter of law, rendering Plaintiff's Complaint time-barred in its entirety.

**B. Plaintiff's Claims Fall Within The Ambit Of Her Agreement To Arbitrate Any Disputes Or Claims Arising Out Of Her Employment.**

10

Michigan law governs the question of whether an arbitration agreement exists. In determining whether an arbitration agreement is valid and enforceable, courts consider whether: (1) there is a valid, binding agreement to arbitrate; (2) the statute prohibits such agreements; and (3) the arbitration procedure is fair. *Rembert v Ryan's Family Steak Houses, Inc*, 235 Mich App 156. Generally, arbitration agreements are interpreted in the same manner as ordinary contracts.[5] *Bayati v Bayati*, 264 Mich App 595, 599; 691 NW2d 812 (2004). When presented with an arbitration agreement, which contains a potentially improper provision, a court should attempt to interpret the provision in a way which renders it valid and enforceable according to the presumed intent of the parties. *Fromm v MEEMIC Ins Co*, 264 Mich App 302, 306; 690 NW2d 528 (2004).

Foremost, the arbitration agreement in the present case is supported by sufficient consideration.[6] CRL's agreement to employ Plaintiff and bind itself to the arbitration agreement, thereby foreclosing its right to seek redress in the courts constitutes consideration.[7] In short, by choosing to sign the Agreement, Plaintiff manifested her consent to participate in the provisions of the Agreement compelling that any employment dispute be arbitrated.[8]

---

[5] A valid and enforceable contract must satisfy the following requirements: (1) parties are competent to contract; (2) proper subject matter; (3) legal consideration; (4) mutuality of agreement; and (5) mutuality of obligation. *Thomas v Leja*, 187 Mich App 418, 422; 468 NW2d 58 (1991). All requirements are satisfied in the present case.

[6] Consideration is demonstrated by a benefit on one side or a detriment suffered, or service done on the other." *General Motors Corp v Dept of Treasury, Revenue Div*, 466 Mich 231, 238; 644 NW2d 734 (2002). A mutuality of obligation means that there is consideration. *Toussaint v Blue Cross & Blue Shield of Mich*, 408 Mich 579, 600; 292 NW2d 880 (1980).

[7] *See, e.g.*, *Tinder v Pinkerton Security* 305 F3d 728 (7th Cir 2002) (employee's continued employment and employer's promise to bind itself to arbitration policy is sufficient consideration for employee's promise to arbitrate).

[8] A written arbitration agreement does not even need to be signed in order to be binding under Michigan law. *Ehresman v Bultynck & Co, PC*, 203 Mich App 350, 354; 511 NW2d 724 (1994); *Green v Gallucci*, 169 Mich App 533; 426 NW2d 693 (1988).

Moreover, the Agreement between the parties determines the scope of arbitration. *Schreier, supra* at *13, *citing Rooyakker & Sitz, PLLC v Plante & Moran*, PLLC, 276 Mich App 146, 163; 742 NW2d 409 (2007). "To ascertain the arbitrability of an issue, the court must consider whether there is an arbitration provision in the parties' contract, whether the disputed issue is arguably within the arbitration clause, and whether the dispute is expressly exempt from arbitration by the terms of the contract." *Id.* "Any doubts about the arbitrability of an issue should be resolved in favor of arbitration." *Watts v Polaczyk*, 242 Mich App 600, 608; 619 NW2d 714 (2000). "The burden is on the party seeking to show nonarbitrability." *Rembert*, 235 Mich App at 129. Overall, Michigan public policy overwhelmingly favors arbitration as an inexpensive and expeditious alternative to litigation. *Madison Dist. Pub Schs v Myers*, 247 Mich App 583, 600, 637 NW2d 526 (2001); *Rembert*, 235 Mich App at 123.

Here, there is no doubt that all of Plaintiff's claims arose out of her employment with CRL, a successor of PAI, a subsidiary of SAIC. The arbitration provision at issue is broad and clear. It specifically provides that any "statutory, contractual and/or common law claims or controversies" that Employee may have against SAIC, its subsidiaries or successors, or any of their "officers, directors, employees or agents" must be arbitrated. Indeed, claims specified as subject to arbitration include: claims for discrimination, harassment, breach of contract, violation of any federal, state or other law, statute or regulation, and tort claims including but not limited to, negligent or intentional injury. This language clearly encompasses Plaintiff's claims in this case. Accordingly, Plaintiff's arbitration agreement is binding and enforceable and her claims are arbitrable.

   **1. The Arbitration Agreement Extends To Plaintiff's Claims Against CRL and Jackson.**

12

An arbitration agreement may be extended to persons who were not parties to the agreement. *Rooyakker & Sitz, PLLC v Plante & Moran, PLLC*, 276 Mich App 146, 162-164; 742 NW2d 409 (2007). This Court must look to the terms of the agreement to determine the scope of arbitration and whether the dispute is expressly exempt from arbitration by the terms of the contract. *Id.* at 163. Here, CRL and Jackson were third party beneficiaries of the contract between Plaintiff and PAI, a subsidiary of SAIC. *See* MCL 600.1405 (defining beneficiary as "[a]ny person for whose benefit a promise is made by way of contract . . . has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promise."). The unambiguous terms of the arbitration provision indicate that all claims against SAIC or its subsidiaries, as well as their successors, agents and employees are subject to arbitration. As previously noted, Plaintiff alleges that Jackson was an employee and/or agent of CRL, a successor of PAI (SAIC's subsidiary), and therefore, a third party beneficiary of the agreement. Accordingly, Plaintiff is bound by the terms of the arbitration agreement that she signed.

**2. If Arbitration Is Ordered, This Case Should Be Dismissed To Allow The Matter to Proceed To Arbitration Or, At A Minimum, Should Be Stayed Until The Matter is Arbitrated.**

If the Court does not otherwise dismiss Plaintiffs' claims as time-barred, and finds the arbitration agreement to be valid and enforceable, this Court should dismiss the action with prejudice, and allow Plaintiff to pursue her claims through arbitration, if she so desires. Alternatively, at a minimum, this Court should stay this litigation both while this motion is pending and pending resolution of the arbitration. *See* MCR 3.602(C) ("Subject to MCR 3.310(E), an action or proceeding involving an issue subject to arbitration must be stayed if an order for arbitration or a motion for such an order has been made under this rule. If the issue subject to arbitration is severable, the stay may be limited to that issue. If a motion for an order compelling

arbitration is made in the action or proceeding in which the issue is raised, an order for arbitration must include a stay.")  A stay will also avoid wasting the efforts and resources of the Court and the parties.

## V.  CONCLUSION

WHEREFORE, Defendants CRL and Jackson respectfully request that this Court dismiss with prejudice all claims of Plaintiff Julie Powers against CRL and Jackson, in their entirety, enter judgment in favor of the CRL Defendants, and award the CRL Defendants their costs, fees and such other relief as this Court deems just and appropriate.

Respectfully submitted,

Dated:  September 1, 2016

JACKSON LEWIS P.C.

BY:    _/s/Emily M. Petroski_____
EMILY M. PETROSKI (P63336)
Attorneys for Defendants Charles River
Laboratories, Inc. and Susan Jackson
2000 Town Center, Suite 1650
Southfield, MI 48075
(248) 936-1900 - phone
(248) 936-1901 – fax
petroske@jacksonlewis.com

**PROOF OF SERVICE**

The undersigned hereby certifies that the foregoing instrument was served upon all parties in the above case at their respective addresses disclosed on the pleadings on September 1, 2016 by:

☐ Hand Delivery          X Julie Powers via U. S. Mail
☐ ECF                    ☐ FAX
X Roberto Romero via Email


_____/s/Emily Petroski_____
Emily Petroski

15

# Exhibit A

| STATE OF MICHIGAN<br>THIRD JUDICIAL CIRCUIT<br>WAYNE COUNTY | SUMMONS AND COMPLAINT | CASE NO.<br>16-009848-CD<br>Hon. Daniel A. Hathaway |
|---|---|---|

2 Woodward Ave., Detroit MI 48226

Court Telephone No. 313-224-2365

| **Plaintiff**<br>Powers, Julie | v | **Defendant**<br>Charles River Laboratories, Inc. |
|---|---|---|
| **Plaintiff's Attorney**<br><br>367 Moross Road<br>Grosse Pointe Farms, MI 48236 | | **Defendant's Attorney** |

**SUMMONS**  **NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state). (MCR 2.111[C])
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued<br>8/ 4/2016 | This summons expires<br>11/ 3/2016 | Court clerk<br>File & Serve Tyler |
|---|---|---|

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

**COMPLAINT**  *Instruction: The following is information that is required to be in the caption of every complaint and is to be completed by the plaintiff. Actual allegations and the claim for relief must be stated on additional complaint pages and attached to this form.*
☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

**Family Division Cases**
☐ There is no other pending or resolved action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties.
☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.
The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|

**General Civil Cases**
☑ There is no other pending or resolved civil action arise out of the same transaction or occurrence as alleged in the complaint.
☐ An civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.
The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|

**VENUE**

| Plaintiff(s) residence (include city, township, or village)<br>Grosse Pointe Farms, Michigan, Wayne County | Defendant(s) residence (include city, township, or village)<br>Wilmington, Massachusetts, Middlesex County |
|---|---|
| Place where action arose or business conducted<br>Detroit, Michigan, Wayne County | |

08/05/2016
_____
Date

Signature of attorney/plaintiff



If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

MC 01 (5/15) **SUMMONS AND COMPLAINT** MCR 2.102(B)(11), MCR 2.104, MCR 2.105, MCR 2.107, MCR 2.113(C)(2)(a),(b), MCR 3.206(A)

FILED IN MY OFFICE
WAYNE COUNTY CLERK
8/4/2016 2:34:40 PM
CATHY M. GARRETT

# STATE OF MICHIGAN
## THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

JULIE POWERS, in PRO PER        Case No.:
     Plaintiff               Hon:_____

-v-

CHARLES RIVER LABORATORIES
SUSAN JACKSON, individually and in her official capacity       16-009848-CD
ROBERTO ROMERO, individually and in his official capacity

      Defendants, jointly and severally

There is no other pending or resolved civil action arising out of the transaction or occurrence alleged in the complaint

## COMPLAINT AND JURY DEMAND

Now Comes Plaintiff, JULIE POWERS ("Ms. Powers") in PRO PER, and for her complaint against Defendants states the following:

## INTRODUCTION

1. This is an action for damages brought by Plaintiff for Defendants' violations of THE ELLIOT LARSEN CIVIL RIGHTS ACT OF 1976 [MCL § 37.2201 *et seq.*] and common laws: NEGLIGENCE, BREACH OF CONTRACT and INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

## PARTIES

2. Plaintiff, MS. POWERS, is an individual residing at 367 Moross Rd., Grosse Pointe Farms, Wayne County, Michigan.

3. Defendant, CHARLES RIVER LABORATORIES, INC. ("CRL"), headquartered in Wilmington, Massachusetts, is a Federal Government contractor, contracted by the National Institutes of Health (NIH) under a Federal Government professional services contract to provide staffing positions to the Perinatology Research Branch (PRB), a Federal Government intramural research facility of the *Eunice Kennedy* Shriver National Institute of Child Health and Human Development, National Institutes of Health, Department of Health and Human Services (NIH), which is housed within Wayne State University, Hutzel Women's Hospital, 3990 John R, Detroit, MI 48201, located in Wayne County, Michigan.

4. Defendant, SUSAN JACKSON ("Ms. Jackson"), is the Division Director of Human Resources at CRL's business unit, Insourcing Solutions, located in Germantown, Maryland.

5. Defendant, ROBERTO ROMERO, MD ("Dr. Romero"), is Chief of the PRB and Head of the Program for Perinatal Research and Obstetrics, NICHD, NIH, DHHS, which is located at 3990 John R, Detroit, MI in Wayne County, Michigan, and who, on information and belief, resides at 21 Fisher Rd, Grosse Pointe, MI 48230, located in Wayne County, Michigan.

## JURISDICTION AND VENUE

6. The events giving rise to this cause of action arose in the County of Wayne, State of Michigan.

7. CRL has been consistently conducting business in Wayne County, Michigan since 1997.

8. Defendant, Ms. Jackson, as an agent of CRL, is responsible for providing Equal

Employment Opportunity/Affirmative Action Employer oversight to CRL employees, pursuant to a Federal Government contract, assigned to the PRB located in Wayne County, Michigan.

9.  Defendant, Dr. Romero resides at 21 Fisher Rd, Grosse Pointe, MI 48230, located in Wayne County, Michigan.

10. This court has jurisdiction over Plaintiff's state law claims of discrimination and retaliation in violation of the Elliott Larsen Civil Rights Act ("ELCRA"), MCL 37.2102, et seq., as well as the relevant claims included within.

11. The amount in controversy is in excess of Seventy-Five Thousand Dollars ($75,000.00).

12. Venue is properly laid in this Court pursuant to MCL §600.705(2).


## BACKGROUND/STATEMENT OF FACTS

13. Plaintiff incorporates by reference paragraphs one through twelve.

14. Plaintiff, Ms. Powers was an employee of Defendant, CRL, from September 24, 1997 through February 9, 2015 to provide Federal Government contracted professional services to the PRB.

15. Under the provisions expressly enumerated in Federal Government Service Contracts, Federal Government contractors (who voluntarily respond to Federal Government Request for Proposals and are awarded contracts by the Federal Government to fulfill said contracts, funded by taxpayer monies) are contractually obligated to "ensure" EEO/AAE compliance in the workplace and required by contract and Federal Acquisition

Regulations (FAR) established by legislation to proactively provide consistent, due-diligence oversight, supervision and ongoing monitoring of conditions in the workplace in compliance with all EEO regulations and published guidelines, as well as adherence to all State and Local statutes and regulations that exceed EEO/AAE protections in the locales in which the contract requires the contractor to conduct business.

16. Defendant, CRL, is a United States Government contractor, contracted with the NIH to provide for the recruitment, hiring, supervision, administrative management and EEOC/AAE compliant human resources services to CRL employees providing professional services within various branches within the NIH, including 4-6 staffing positions located at the PRB in Detroit, Michigan.

17. Ms. Powers was assigned to the PRB as an Administrative Support Specialist IV, based on her prior level of experience and qualifications to meet the Job Description pursuant to CRL's Federal Government contract with the NIH and was responsible for providing executive administrative support services to Defendant, Dr. Romero.

18. Since approximately 2008, neither CRL, nor its representatives, had been on site at the PRB to monitor conditions in the workplace.

19. CRL Human Resources, located in Germantown, MD, failed to provide any EEO/AAE education or professional development training to Ms. Powers, and had not actively sought or inquired about conditions in the workplace at the PRB in Detroit.

20. CRL was rarely in contact with Ms. Powers, provided no supervision or oversight of the workplace at the PRB.

21. CRL ceased to conduct yearly performance reviews for Ms. Powers or any CRL staff

working at the PRB since 2011.

22. Defendant, Dr. Romero, is a Federal Government employee appointed by the NICHD as Chief of the Perinatology Research Branch and, in practice, was effectively Ms. Powers' supervisor, determining her priorities, responsibilities, assignments, and schedule, as well as held the power to hire, enact employee disciplinary actions and terminate CRL employees at the PRB.

23. Ms. Powers consistently earned excellent job performance reviews throughout her tenure with the PRB for approximately 18 years under the employ of CRL.

24. In December, 2006 and prior to April, 22, 2013, Ms. Powers was given the job title: "PRB Chief of Staff" by Defendant, Dr. Romero, and given the responsibilities of managing the administrative staff and office operations and to provide administrative support services to Dr. Romero.

25. As Chief of Staff, Ms. Powers was required to make herself made available 24/7 and put in a significant amount of overtime to cover her job duties and staff shortages, often on weekends, evenings, holidays, vacations, etc.

26. Ms. Powers was required to sacrifice unused vacation time accrued and lost over the years to meet Dr. Romero's unreasonable demands due the the PRB being perpetually short staffed, resulting from the hostile environment, compounding Ms. Powers chronic stress as she was required to be available at all hours of the night, weekends, days off, holidays, weddings and funerals and vacation due to the inability to retain staff.

27. Taking vacation time would, at times, result in various forms of punishment from Dr. Romero, including: the silent treatment, excessive nitpicking and berating for

insignificant errors (often the fault of Dr. Romero's erratic management style) and subjected to inappropriate personal remarks about Ms. Powers' intelligence, mental health and age – implying that she was "too old" to handle the job.

28. During the course of her employment, and particularly after 2009, Dr. Romero, initiated an increasingly hostile work environment, arbitrarily subjecting Ms. Powers to systematic bullying, intimidation, ridicule, mockery, threats, public humiliation, and other forms of abusive behavior.

29. Dr. Romero's abusive behavior consisted of remarks asking her "how much CRL was paying her?" "what could she do to earn her salary?" "who would ever hire her if she left the PRB?" that "people saw her as incompetent," etc.

30. Dr. Romero would frequently get irrationally angry and vociferously berate Ms. Powers if she misspelled a word while she was taking dictation, which led him to demean Ms. Powers, questioning if she had a "psychiatric condition," and stating "if someone has a psychiatric condition, they often don't realize it."

31. Many of Dr. Romero's abusive remarks were related to Ms. Powers' age, including critical statements in response to minor and inconsequential errors of administrative personnel and that these errors were due to Ms. Powers' "incompetence" indicating that she was too old to handle the administrative management of the PRB.

32. On at least one occasion, Dr. Romero inappropriately stated to Ms. Powers that her "memory problems" could not be due to "post-menopausal symptoms" because she was "well beyond that stage," negating the more likely explanation that if Ms. Powers had actually displayed memory problems, it was because she was overworked, perpetually

understaffed and subjected to fear induced chronic stress attributable to the untenable abuse and hostile environment perpetrated by Dr. Romero's bullying and intimidation.

33. Dr. Romero's hostile attacks frequently occurred in a closed office from which Ms. Powers was unable to easily escape and at times the level of rage directed toward Ms. Powers put her in fear for her physical safety.

34. Endurance of Dr. Romero's abusive behavior became a condition Ms. Powers' employment and was so severe and pervasive it created a work environment that a reasonable person would consider intimidating, hostile and abusive.

35. In 2012, Ms. Powers began psychiatric treatment to cope with the escalating hostile work environment and verbal abuse perpetrated by Dr. Romero.

36. Prior to initiating psychiatric treatment in 2012, Ms. Powers' medical records indicate no previous history of psychiatric treatment.

37. In April 2013, Ms. Powers (age 54 and a member of a protected class) was demoted and replaced by another CRL employee, Ms. Somaira Hussaini (age 25), who had been hired by CRL as an Administrative Support Specialist III and had been working at the PRB for approximately one year.

38. Ms. Hussaini lacked the basic qualifications, training and experience to perform independently and effectively in Ms. Powers' former position or meet the requirements of the Federal Government's Statement of Work to be hired in the position.

39. Dr. Romero informed Ms. Powers that Ms. Hussaini would be moving into Ms. Powers' office, located in the executive office suite next to Dr. Romero's office with a private entrance to Dr. Romero's office.

40. Dr. Romero instructed Ms. Powers to vacate her private office in the executive suite and move to Ms. Hussaini desk in the outer office, occupied by lower level administrative support staff serving the PRB, whom Ms. Powers formerly supervised.

41. Ms. Hussaini's salary was subsequently increased (by approximately $18,000) to $60,000 annually, and she was promoted to the same level as Ms. Powers (Administrative Support Specialist IV), although she lacked appropriate knowledge and skills described in the job description.

42. Ms. Powers was then required to schedule appointments through Ms. Hussaini to speak to Dr. Romero, and Ms. Hussaini began scheduling Ms. Powers' time.

43. On August 5, 2013, Ms. Powers was demoted a second time, and instructed by Dr. Romero to move to an office down the hall, segregated from the executive offices where Dr. Romero's office is located, completely removed from access to the daily workings of the administrative staff.

44. Dr. Romero then informed Ms. Powers that Ms. Hussaini and Andrea Bernard, a Wayne State employee providing services at the PRB, would be responsible for assigning Ms. Powers' duties, including determining her priorities and work schedule and monitoring the status of her assigned tasks.

45. Both Ms. Hussaini and Ms. Bernard were previously subordinates whom Ms. Powers had supervised in her duties as Chief of Staff.

46. Ms. Powers was 54 years of age at the time of these occurrences, and therefore, a member of a protected class.

47. After Ms. Powers' second demotion and removal from the administrative offices, her title

frame below her name on her office door was deliberately left blank, causing extreme humiliation and embarrassment.

48. After Ms. Powers' second demotion, over the course of the ensuing several months, segregated from the executive administrative offices, Dr. Romero arbitrarily subjected Ms. Powers to escalating hostility, abuse and threats while in an isolated and closed office in which Ms. Powers couldn't easily escape causing Ms. Powers to fear for her physical safety.

49. In December 2013, Dr. Romero's bullying and intimidating behavior toward Ms. Powers had become so abusive and persistent, creating a hostile work environment so severe that Ms. Powers' level of anxiety and depression rendered her unable to perform at her prior level of effective functioning at work and at home, and forced to leave her job for mental health reasons.

50. On December 19, 2013, Ms. Powers, following the consensus recommendations issued by her healthcare providers, initiated medical leave for mental health reasons due to severe psychological symptoms, and received DSM-IV diagnoses of Major Depressive Disorder, Generalized Anxiety Disorder, and Attention Deficit Disorder, subsequently culminating in a diagnosis of PTSD, attributed to long-term, chronic exposure to a psychologically abusive and damaging work environment.

51. On December 20, 2013, Ms. Powers was contacted by Ms. Kim Ross, CRL Human Resources Representative and Benefits Specialist, who notified her that she would forward paperwork to be placed on FMLA and short term disability. Ms. Ross informed Ms. Powers that she was not to check her work email accounts or answer any calls from the office while on medical leave.

52. Dr. Romero subsequently tried to contact Ms. Powers during her medical leave via text and voicemail messages. Ms. Powers, following the instructions of Ms. Ross, did not return the calls or respond. Dr. Romero's attempts to contact Ms. Powers instigated intense anxiety and fear of reprisal for not responding to Dr. Romero.

53. Ms. Powers was placed on short term disability for six months, and her medical leave was extended based on periodic ADAA questionnaires submitted by her health care provider, as well as periodic discussions with Ms. Ross regarding Ms. Powers continued treatment with her psychiatrist and therapist and her intentions of returning to work.

54. On September 18, 2014, Ms. Powers informed Ms. Ross via email that her therapist determined that the stressful working conditions at the PRB, and specifically, working for Dr. Romero were the cause of her medical condition.

55. On November 4, 2014, Ms. Powers was contacted again by Ms. Ross, regarding Ms. Powers' most recent prognosis of continued disability submitted to CRL by her psychiatrist, Dr. Guerrero, stating that due to the severity of her symptoms, Ms. Powers remained fully disabled and unable to return to work at the PRB.

56. During this conversation, Ms. Powers, emotionally distraught, revealed to Ms. Ross the exact nature of the work-related harassment as the cause of her disability. Ms. Ross acknowledged awareness of Dr. Romero's aggressive and hostile manner and indicated a widespread awareness among CRL Human Resources staff that Dr. Romero had a "reputation for being an intimidating personality." Ms. Ross indicated that she would inform Defendant, Ms. Jackson, CRL Division Director of Human Resources.

57. Ms. Jackson contacted Ms. Powers on November 7. Ms. Powers informed Ms. Jackson as

to the cause of her current medical condition, reiterating her description of the hostile

work environment at the PRB which led to her illness and that her demotion and the

abuse were due to her age and resulted from Age Discrimination.

58. Ms. Jackson expressed empathy and also acknowledged Dr. Romero's reputation as being

very difficult to work for.

59. Ms. Jackson offered Ms. Powers the standard severance of 13 weeks of pay, with the

possibility of extending her health insurance benefits (a portion of which Ms. Powers had

to pay) and that CRL would not fight Ms. Powers' unemployment, and that Ms. Powers

should take some time to think about the offer in order to put this "awful ordeal behind

her."

60. Ms. Powers subsequently declined the offer of severance, explaining to Ms. Jackson her

22 year background working directly with Dr. Romero, reiterating the increasing hostility

she endured under the supervision of Dr. Romero, the magnitude of her illness (thus not

being eligible to collect unemployment), her fear of retaliation for making a claim against

Dr. Romero, current and future financial losses and it's impact on her family, and that,

according to her doctors, it would take a great deal of time and therapy before she was

well enough to seek employment elsewhere, and that in so doing, she would find it very

difficult to match the salary, benefits and responsibilities she had working at the PRB.

Ms. Powers stated that, based on these facts, as well as her previous plans to retire from

that job, she would consider a higher severance. Ms. Jackson told Ms. Powers that it was

beyond her authority to approve a higher severance, and promised to address the matter

with her supervisors and the legal department at CRL and call her back.

61. During the initial telephone conversation with Ms. Jackson, and subsequent

communications thereafter, Ms. Jackson made assurances to Ms. Powers that CRL took all claims seriously, and that there would be an immediate investigation, which would be reported to the NIH.

62.   Trusting in the good-faith representations made by Ms. Jackson on behalf of CRL, Ms. Jackson and Ms. Powers communicated a number of times between November, 2014 and March 16, 2015, in which Ms. Powers presented numerous examples of the hostile and abusive work environment, demotion, and age discrimination, and provided names of witnesses who could support her claims: Keltia Franke (former CRL employee, who left CRL after exhausting her medical leave, who, according to her healthcare provider, could not return to her job due to the hostile working environment), Mr. John Person (former PRB Project Manager for 15 years), and Ms. Heather Millar (former CRL employee). Based on her experience with Dr. Romero, Ms. Powers stated her concern that people would be reluctant to come forward or get involved because they either feared some form of retaliation from Dr. Romero or that employees would view it as an opportunity to get into the good graces of Dr. Romero to immunize themselves from being a target of hostility by demonstrating loyalty.

63.   During this series of telephone conversations, an ongoing question from Ms. Jackson was, "Why Ms. Powers had not reported the situation sooner?" To which, Ms. Powers explained was largely due to fear of losing her job, security, benefits, since it was Ms. Powers' experience from working with Dr. Romero that one does not make complaints against him for fear of retaliation.

64.   Ms. Powers also expressed that Dr. Romero is highly influential in the research community, with a long reach as he has many highly placed collaborators at NIH and

prestigious universities around the world; many of them owing their positions to him, as well as faculty and fellows whose career advancement is dependent on Dr. Romero and that she feared that witnesses would be reluctant to come forward or be inclined to side with Dr. Romero and not be truthful out of fear of repercussions or to gain benefit.

65. At one point, Ms. Jackson stated to Ms. Powers that, "*Unfortunately bullying was not against the law in Michigan.*" Ms. Jackson also indicated, when discussing the salary increase of Somaira Hussaini, that Ms. Powers' salary was quite a bit higher than Ms. Hussaini's ($67,288 vs $60,000, respectively), totally disregarding Ms. Hussaini's qualifications for the job and significant salary increase within the short time Ms. Hussaini had been employed by CRL in relation to Ms. Powers 22 years of experience at the PRB to reach her current level of salary and considered it disparate treatment.

66. During the period between November 7, 2014 and February 19, 2015, almost all communications had to be initiated by Ms. Powers after Ms. Jackson had failed on promises to get back with Ms. Powers by a certain time.

67. During the period between November 7, 2014 and February 19, 2015, Ms. Jackson had failed to contact Ms. Powers' witnesses.

68. Ms. Powers' major concern, expressed in her conversations with Ms. Jackson and documented in emails, was the inherent conflict of interest for CRL to conduct its own EEO compliant investigation into itself. Ms. Powers explained that her concerns were based on the relationship between Dr. Romero and CRL. Ms. Powers cited Dr. Romero's frequent threats to terminate CRL as a contractor at the slightest opposition to his demands. Ms. Powers was also concerned that CRL, threatened with contract termination, would be inclined to eschew conducting a thorough EEOC investigation

versus forfeiting the revenue stream the contract provides as well as liabilities for CRL's non-compliance with the Federal Government contract and subject to the False Claims Act and that the cost benefit analysis would influence CRL's investigational rigor.

69. At some point, Ms. Powers began to be concerned as to Ms. Jackson's veracity and motivations: suspecting that Ms. Jackson had no intention of conducting an honest EEO compliant investigation protocol due the multiple, overlapping conflicts of interest and likely had, in fact, not addressed the matter with her supervisors and the legal department at CRL nor reported Ms. Powers' claims to the NIH, keeping the matter contained solely in her control.

70. In January, 2015, Ms. Powers wrote multiple emails to Ms. Jackson requesting the status of her employment, and was finally informed on January 22 by Ms. Jackson that CRL would need a completed accommodation questionnaire (ADA form) from her healthcare provider since her medical leave was only approved until February 1, 2015, and questioned whether it was her intent to return to work.

71. On February 9, 2015, Ms. Powers' clinical therapist, Elizabeth McCarthy, MA, LPC, under the supervision of Robert Flewelling, Psy.D, LP, completed the ADA form and faxed it, along with her Psychotherapy Intake Notes, to Ms. Ross at CRL. The questionnaire and medical report indicated that Ms. Powers was permanently disabled and could not return to work, and that Ms. Powers' diagnosis of PTSD, *"appeared to be in direct response to excessive emotional and verbal abuse she experienced with her boss, as well (as) the stress of being placed in untenable ethical positions where she has feared for her job and, at times, her physical safety."*

72. Ms. Powers' subsequent attempts to contact Ms. Jackson after February 9 were

unsuccessful until they spoke again on February 19. During this telephone conversation, Ms. Jackson indicated, once again, that she had not yet spoken to Ms. Powers' witnesses. Ms. Powers, again, expressed her concerns, and stated that she held CRL accountable for their lack of oversight and was awaiting the outcome of the investigation.

73. Ms. Jackson promised to get back with Ms. Powers by the end of the day, and did so by leaving a voicemail message at approximately 5:00 pm on February 19. Ms. Powers returned Ms. Jackson's call within 5 minutes, but reached her voicemail, to which Ms. Jackson never responded or made any further attempt to contact Ms. Powers.

74. Ms. Powers made numerous subsequent attempts to contact Ms. Jackson through email and voicemail messages over the course of the following several weeks.

75. On March 9, 2015 Ms. Powers sent another email message citing CRL's responsibilities as a government contractor, and the numerous red flags over a period of years indicating the existence of a hostile work environment, as well as EEOC laws related to such abuse, which prompted Ms. Jackson to communicate and set up a telephone appointment for the following morning, March 10, 2015.

76. During their March 10 telephone conversation, Ms. Jackson informed Ms. Powers that she contacted the people whose names Ms. Powers provided, as well as others, and in summary, based on these interviews, people indicated that the PRB was not a hostile work environment. Ms. Jackson went on to state that one person remarked that *Dr. Romero held himself to a set of high professional standards, and expected the same from others and that someone said that once one got used to Dr. Romero's type of work ethic, he was considered to be fair.* Ms. Jackson mentioned speaking to Keltia Franke and Heather Millar, in particular, and indicated that Keltia Franke informed her that the

hostile work environment was not the reason she left the PRB on medical leave, but was the reason she could not return.

77. Ms. Jackson also stated that Somaira Hussaini was qualified to be an Administrative Support Specialist IV, had prior administrative experience, and had been pursuing a bachelors degree before her employment with CRL, and further informed Ms. Powers that Ms. Powers had not been demoted because she received no decrease in salary and was still considered Dr. Romero's Chief of Staff. This conversation ended with Ms. Jackson's determination that Ms. Powers' claims could not be substantiated, and that Ms. Jackson would have Ms. Ross draw up and send the Cobra documents related to Ms. Powers' termination with CRL, and that Ms. Powers should let CRL know if she was still interested in the 13 weeks of severance previously offered.

78. Ms. Powers has knowledge and has obtained confirmation that the statement made by Ms. Jackson regarding Keltia Franke is false.

79. Ms. Franke's discussion with Ms. Jackson, according to discussions and email communications she sent to Ms. Powers, likened the atmosphere at the PRB and working for Dr. Romero as "Stockholm Syndrome," among other things.

80. Ms. Powers emailed Ms. Jackson the following day, March 11, 2015, summarizing their their March 10 telephone conversation and requested that Ms. Jackson confirm her statements in writing, if she objected or differed with the contents, as well as send her some additional information used to conduct her investigation, which included: *A list of names of the people interviewed, including current employees working at the PRB (both CRL and WSU), former CRL employees, those within CRL, etc.; If the people to whom Ms. Jackson spoke knew who made the complaint; Was an internal investigation*

*conducted on site in Detroit, and if so, when; Was Dr. Romero made aware of Ms. Powers' claim, and if so, at what time during the    investigation?* Ms. Powers also requested the following: *A copy of CRLs contract with the NIH; CRL policy on conducting such investigations into these complaints; whether or not this matter has been addressed or conveyed to anyone at the NIH; the names and email addresses of Ms. Jackson's supervisor and head of CRL's legal department;* and *the report of CRL's determination.*

81. Ms. Jackson replied to Ms. Powers March 11 email on March 16; however the email only summarily addressed the events, neither confirming nor denying Ms. Jackson's statements made in their March 10 telephone conversation, nor did it contain any of the information requested by Ms. Powers. Ms. Jackson also stated that if Ms. Powers had any further information regarding her claims, that she would look into it.

82. In response to her request for new information, Ms. Powers sent an email to Ms. Jackson on March 31, 2015, referring her to Ms. Amy Partridge, a former CRL employee and Executive Assistant to Dr. Romero for 10 years, who left the PRB for another job around 2007, taking a significant pay cut, as she could no longer tolerate the way she was treated by Dr. Romero and would corroborate the hostile environment at the PRB.

83. Upon knowledge and belief, Ms. Jackson made no attempt to contact Ms. Partridge.

84. Ms. Powers was informed of her termination on March 10, 2015; however, later learned that her termination was actually effective February 9, 2015 and her health insurance had been cancelled on February 28, 2015 without proper notice.

85. Ms. Powers had to, once again, initiate contact with CRL representatives to clarify her

termination date and request the appropriate COBRA documents, which were finally received on March 26, 2015.

86.  Ms. Powers and her husband, Brian Powers, subsequently wrote to David Johst, Corporate Executive Vice President of Human Resources and General Counsel and Chief Administrative Officer on June 3, 2015 reporting the inconsistencies in the investigation conducted by Ms. Jackson. This letter also provided further evidence Ms. Powers had within her possession related to the hostile work environment, demotion and age discrimination claims of Ms. Powers, as requested by Ms. Jackson, as well as issues of CRLs non-compliance and responsibilities as a Federal Government contractor, their lack of oversight as Ms. Powers' employer, etc.

87.  Included in the June 3 letter to David Johst, and of particular significance, is a letter written by Dr. Romero berating Ms. Powers on a certain matter, which clearly states "...you were acting as Chief of Staff at the time", thereby proving Ms. Powers' demotion.

88.  Mr. Powers received telephone calls from Mr. Scot Plotnick, a CRL attorney, on June 11 and 17, 2015, who acknowledged the letter, and requested more time to review the matter.

89.  Mr. Plotnick contacted Mr. Powers on June 25, 2015, and indicated that he saw "no actionable claims"; however, said that he "felt sorry" for Ms. Powers and would offer the "original" 14 weeks severance previously mentioned by Ms. Jackson, to which Ms. Powers declined.

90.  Ms. Powers subsequently sent two email messages to both Mr. Plotnick and Mr. Johst, requesting clarification for Mr. Plotnick's remarks, whether Mr. Plotnick was satisfied

with Ms. Jackson's investigation, and if CRL had reported these matters to the NIH. Neither Mr. Plotnick nor Mr. Johst replied to Ms. Powers.

91. As a result of the acts alleged above and the pattern of discriminatory treatment, Ms. Powers has suffered actual damages, loss of employment income and benefits, loss of and impairment of future earning capacity and ability to work, as well as emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment and the physical effects associated therewith, and will so suffer in the future.

## COUNT I: ELLIOT-LARSEN CIVIL RIGHTS ACT – AGE-HARASSMENT DISCRIMINATION AS TO ALL DEFENDANTS

92. Plaintiff incorporates by reference by reference the allegations set forth in the preceding paragraphs of the Complaint as though set forth at length herein.

93. At all material times, Ms. Powers was an employee of CRL, and Dr. Romero was Ms. Powers' supervisor, covered by and within the meaning of the Michigan Elliott-Larsen Civil Rights Act, MCL 37201 *et seq*.

94. Ms. Powers was 54 years old, and, therefore, was a member of classes protected pursuant to ELCRA.

95. Dr. Romero's abusive behavior and remarks directed at Ms. Powers were directly related to Ms. Powers' age, implicitly and explicitly as described above communicating that she was too old and no longer up for the job.

96. Dr. Romero's age-harassment created a hostile work environment over the course of multiple years.

97. Ms. Powers had stellar performance reviews approved by Dr. Romero from 1997 through 2011, at which time CRL ceased to implement performance reviews, without explanation or communicating a change in policy as rationale for no longer asking for or requiring reviews to be completed.

98. Ms. Powers was first demoted in April 2013 and replaced by 25 year-old individual with one year experience who, by any objective standard lacked the fundamental experience knowledge and skills to perform competently in the position.

99. Ms. Powers received a second demotion on August 5, 2013, by Dr. Romero and was assigned to a position in which her schedule, tasks, priorities and daily assignments were monitored and supervised by Ms. Hussaini and Ms. Bernard, former subordinates, both with fewer qualifications and of a non-protected class.

100. On August 5, 2013, Ms. Powers, assigned to work in an office segregated from the executive administrative offices in which the essential tasks of administrative staff were carried out.

101. Defendants owed Ms. Powers a duty not to discriminate against her with respect to employment, promotional opportunities, compensation or other conditions or privileges of employment on the basis of her age.

102. Ms. Powers' age was a factor that made a difference in Defendants decision to subject her to the wrongful and discriminatory treatment, including demotion and/or disparate treatment.

103. Defendants and/or their agents, representatives, and employees, were predisposed to discriminate on the basis of age and acted in accordance with that predisposition.

104. While employed by Defendants, Ms. Powers was subjected to Age Discrimination by Defendants and/or their agents, servants and/or employees, said acts being made unlawful by the ELCRA, MCLA 37201, *et seq.*

105. Defendants subjected Ms. Powers to disparate treatment in whole or in part because of her age, to-wit: 54 years old. Such acts include, but are not limited to:

A.      Terminating Ms. Powers and/or

B.      Subjecting Ms. Powers to harassment which included remarks related to her age, such as questioning her psychiatric condition, who would ever hire her if she were to look for another job, discussions about her post-menopausal state, etc. Such harassment was sufficiently severe or pervasive to create a hostile environment on the basis of Ms. Powers age.

106. Defendants and their agents, servants and/or employees, intentionally discriminated against Ms. Powers on account of her age in violation of the ELCRA by the following acts:

A.      Discharging or otherwise discriminating against Ms. Powers with respect to her employment, compensation, or a term, condition or privilege of employment, because of age;

B.      Limiting, segregating, or classifying Ms. Powers in a way which deprived or tended to deprive Ms. Powers of an employment opportunity or otherwise adversely affecting the status of Ms. Powers because of age;

C.      Segregating, classifying or otherwise discriminating against Ms. Powers on the basis of age with respect to a term, condition, or privilege of employment, including a

benefit plan or system;

    D.    Creating a hostile work environment on the basis of Ms. Powers' age; and/or

    E.    Failing to provide a work environment free from age discrimination.

107. As a direct and proximate result of Defendants violation of the ELCRA, as aforestated, Ms. Powers has suffered emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment and the physical effects associated therewith, and will so suffer in the future.

108. As a further direct and proximate result of Defendants violation of the ELCRA, Ms. Powers has been placed in financial distress and has suffered a loss of earnings and benefits, and a loss of and impairment of her earning capacity and ability to work and will so suffer in the future; she may be required to employ the services of an attorney to bring this lawsuit and will suffer additional damages in the future.

WHEREFORE, Plaintiff Julie Powers respectfully requests that this Honorable Court grant the following remedies against Defendants CRL, Dr. Romero, and Ms. Jackson:

    A.    Declare that the aforementioned practices and actions of Defendants constitute unlawful employment practices in willful violation of the Elliot-Larsen Civil Rights Act;

    B.    Award Plaintiff all lost wages, past and future, to which she is entitled;

    C.    Award Plaintiff compensatory damages;

    D.    Award Plaintiff reasonable attorney fees, costs and interest;

    E.    Award Plaintiff all punitive damages to which she is entitled; and

F.      Award such other relief as this Court deems just and proper.


## COUNT II: RETALIATION IN VIOLATION OF
## THE ELLIOT LARSEN CIVIL RIGHTS ACT, MCL 37.2101, et seq.
## AS TO CRL AND SUSAN JACKSON

109. Ms. Powers incorporates by reference the allegations set forth in the preceding paragraphs
     of the Complaint as though set forth at length herein.

110. Ms. Powers repeatedly engaged in conduct protected under the ELCRA, i.e., reporting of
     the discriminatory conduct of Dr. Romero, her supervisor, to her employer, CRL, through
     mechanisms established and prescribed by her employer, CRL, as is contractually
     required of all Federal Government contractors, and CRL's own stated policy, as well as
     representations conveyed by Ms. Jackson, an agent of CRL, on which Ms. Powers relied
     and had the reasonable expectations that her claims would be taken seriously and
     investigated in compliance with EEO protocols and guidelines.

111. Defendants, CRL and Ms. Jackson, had knowledge of Ms. Powers' protected activity.

112. Defendants, CRL and Ms. Jackson, subsequently took an adverse, retaliatory action
     against Ms. Powers, including, but not limited to, conducting a prolonged, defective, non-
     compliant EEO investigation into her claims of hostile work environment, harassment,
     and age discrimination, contrary to contractual stipulations and protections afforded Ms.
     Powers as an employee of a Federal Government Contractor, on which Ms. Powers
     relied.

113. Defendants, CRL and Ms. Jackson, subsequently took an adverse, retaliatory action
     against Ms. Powers, including, but not limited to, subterfuge by providing false
     information to Ms. Powers regarding Ms. Jackson's interviews with witnesses in relation

to Ms. Powers claims, inhibiting Ms. Powers ability to fully adjudicate her claims.

114. Defendants, CRL and Ms. Jackson, subsequently took an adverse, retaliatory action against Ms. Powers, including, but not limited to, terminating Ms. Powers, and/or subjecting Ms. Powers to severe or pervasive retaliatory harassment and/or intimidation by terminating her employment and health insurance benefits in February, 2013, prior to properly notifying her in non-compliance with EEO and COBRA requirements.

115. Ms. Powers' protected conduct was a significant factor in Defendants' decision to retaliate against her.

116. The retaliation would not have occurred had Ms. Powers not engaged in activity protected by the ELCRA.

117. Defendants' actions were retaliatory and in violation of the ELCRA.

118. As a direct and proximate result of Defendants' violation of ELCRA as set forth herein, Ms. Powers has suffered emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment and the physical effects associated therewith, and will so suffer in the future.

119. As a further direct and proximate result of Defendants' violation of ELCRA, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, and a loss of and impairment of her earning capacity and ability to work, and will so suffer in the future; she may be required to employ the services of an attorney to bring this lawsuit and will suffer additional damages in the future.

WHEREFORE, Plaintiff Julie Powers respectfully requests that this Honorable Court grant the following remedies against Defendants CRL and Susan Jackson:

A.      Declare that the aforementioned practices and actions of Defendants constitute unlawful employment practices in willful violation of the Elliot-Larsen Civil Rights Act;

B.      Award Plaintiff all lost wages, past and future, to which she is entitled;

C.      Award Plaintiff compensatory damages;

D.      Award Plaintiff reasonable attorney fees, costs and interest; and

E.      Award such other relief as this Court deems just and proper.


## COUNT III: NEGLIGENCE AS TO CRL AND MS. JACKSON

120. Ms. Powers incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as though set forth at length herein.

121. At all material times, Ms. Powers was an employee, and CRL was her employer.

122. As a Federal Government Contractor, CRL is contractually bound to adhere to all employment regulations and protections applicable to Federal Employees as defined by the Equal Employment Opportunity Act and is contractually obligated to implement Affirmative Action Employer (AAE) provisions defined by the EEOC: *"Applicants to and employees of companies with a Federal government contract or subcontract are protected under Federal law from discrimination and requires Federal government contractors to implement Affirmative Action practices and policies to ensure equality of opportunity in all aspects of employment."*

123. CRL failed to comply with Federal Government contractual obligations, as well as CRL's own stated policy, to **proactively ensure** the integrity of the workplace and protect employees from discrimination by providing consistent, diligent oversight, supervision and ongoing monitoring of conditions in the workplace to ensure adherence to

EEOC/AAE regulations, rendering CRL liable for actionable discrimination and damages incurred by Ms. Powers in carrying out her duties at the PRB, as well as CRL's conduct post-submission of her 11/7/14 complaint, in which CRL knowingly and actively further facilitated Age Discrimination and engaged in Retaliation to facilitate a Constructive Discharge.

124. CRL Human Resources Department conducted a defective investigation into claims of Harassment/Age Discrimination/Hostile Work Environment/Constructive Discharge. The investigation, remarkably insufficient in the due diligence required by EEOC Best Practices for Conducting Investigations and CRL's own stated policy, discredits its findings and the veracity of CRL's representations of acting in good faith.

125. According to EEOC best practices, and CRL's policy, for an employer to be compliant, the employer is required to set up a mechanism for a prompt, thorough, and impartial investigation into alleged harassment. The employer should ensure that the individual conducting the investigation will objectively gather and consider the relevant facts. Whoever conducts the investigation should be well-trained in the skills that are required for interviewing witnesses and evaluating credibility as well as evaluating the general resistance of witnesses to be forthcoming when subject to hostile work environments. It would also be important that the individual conducting the investigation be well versed in EEOC terminology, like EEOC criteria to qualify as demotion.

126. CRL's and Ms. Jackson's understanding of EEOC compliance in conducting an investigation is woefully deficient, resulting in unintentional failure to perform an EEOC compliant investigation; or 2) due to multiple conflicts of interest and CRL's consequent greater liability to NICHD, CRL's woefully deficient EEOC noncompliant investigation

was conducted with the intent of not finding anything. Either way, incompetence or intentional, competence to implement and enforce EEOC/AAE guidelines is a contract requirement with the Federal Government. Failure to perform services invoiced to the Federal Government doesn't require intent.

127. Ms. Jackson and Ms. Ross both acknowledged awareness that the PRB was known to be a stressful workplace and that, particularly, Dr. Romero was a difficult, intimidating personality. Ms. Jackson's and Ms. Ross' admissions not only lend credibility to Ms. Powers' claims, they also demonstrate prior knowledge and failure to promptly correct any harassing behavior.

128. CRL and Ms. Jackson voluntarily contracted, promised and/or agreed and thereby assumed a legal duty to ensure that Ms. Powers' complaints of harassment, age discrimination, and hostile work environment were immediately investigated and the investigation conducted in a fair, impartial and/or non-discriminatory manner, pursuant to its express employment policies.

129. CRL and Ms. Jackson breached its duty of care owed to Ms. Powers by and through the following acts and/or omissions, which include but are not limited to:

    A. Failing to supervise and monitor the workplace by not being on site for over five years or completing performance reviews in 2012 and 2013.

    B. Failing to conduct a reasonable, proper and timely investigation.

    C. Failing to abide by its own express and implied employment policies and procedures.

    D. Failing to exercise reasonable care under the circumstances.

E.  Making numerous misleading representations to Ms. Powers subsequent to informing CRL of her complaint of harassment at the PRB regarding EEOC terminology and definitions, i.e. demotion, bullying.

F.  Failing to carry out numerous promises to get back with Ms. Powers within a few days time (or by the "end of the week") of their telephone conversations.

G.  Delaying it's investigation until Ms. Powers employment was terminated to disadvantage her position.

H.  Ms. Jackson's blatant disregard of the report submitted by Ms. Powers therapist, indicating that Ms. Powers diagnosis of PTSD "*appeared to be in direct response to excessive emotional and verbal abuse she experienced with her boss, as well (as) the stress of being placed in untenable ethical positions where she has feared for her job and, at times, her physical safety.*"

I.  Terminating Ms. Powers without any prior notice: In multiple communications and interactions, verbal and email, between February 19 and March 10, CRL purposely neglected to notify Ms. Powers that she had been terminated a month prior (February 9, 2015) and that Ms. Powers' benefits had been terminated on February 28, 2015.

J.  Misrepresenting and omitting vital information from the interviews conducted (i.e. Ms. Franke).

K.  Failing to providing confirmation of statements requested in Ms. Powers' email of March 11, made by Ms. Jackson in their telephone conversation of March 10, and Ms. Powers' request for further documentation were disregarded in Ms. Jackson's

March 16 email.

136. Because the Defendants' conduct toward Ms. Powers was improperly motivated, and was intentional, willful and wanton, Ms. Powers is entitled to punitive exemplary damages in addition to compensatory damages.

137. The above-named Defendants conduct was a direct and proximate cause of the injuries, damages and harm suffered by Ms. Powers.

WHEREFORE, Plaintiff Julie Powers respectfully requests that this Honorable Court grant the following remedies against Defendants CRL and Susan Jackson:

    A. Award Plaintiff all lost wages, past and future, to which she is entitled;

    B. Award Plaintiff compensatory damages;

    C. Award Plaintiff reasonable attorney fees, costs and interest; and

    D. Award such other relief as this Court deems just and proper.

## COUNT IV: BREACH OF CONTRACT AS TO CRL AND MS. JACKSON

138. Ms. Powers incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as though set forth at length herein.

139. As a Federal Government Contractor, CRL is contractually bound to adhere to all employment regulations and protections applicable to Federal Employees as defined by the Equal Employment Opportunity Act and is contractually obligated to implement Affirmative Action Employer (AAE) provisions defined by the EEOC: *"Applicants to and employees of companies with a Federal government contract or subcontract are*

*protected under Federal law from discrimination and requires Federal government contractors to implement Affirmative Action practices and policies to ensure equality of opportunity in all aspects of employment."*

140. CRL failed to comply with Federal Government contractual obligations, as well as CRL's own stated policy, to **proactively ensure** the integrity of the workplace and protect employees from discrimination by providing consistent, diligent oversight, supervision and ongoing monitoring of conditions in the workplace to ensure adherence to EEOC/AAE regulations, rendering CRL liable for actionable discrimination and damages incurred by Ms. Powers in carrying out her duties at the PRB, as well as CRL's conduct post-submission of her 11/7/14 complaint, in which CRL knowingly and actively further facilitated Age Discrimination and engaged in Retaliation to facilitate a Constructive Discharge.

141. CRL promulgated express and written statements of employment policies, practices and procedures which it provided and disseminated to all of its employees, including Ms. Powers.

142. CRL represented, both orally and in writing, that it would treat employees in a specific, fair and equitable manner.

143. Defendant CRL and Ms. Jackson breached its contract by its failure to follow its own practices, policies and procedures with regard to the terms and conditions of Plaintiff's employment as set forth herein.

144. As set forth herein, CRL and Ms. Jackson intentionally, willfully and/or maliciously breached its contract with Plaintiff.

145. At all relevant times, Ms. Powers understood and reasonably relied on the aforementioned policies and procedures to her detriment and harm, both pecuniary and otherwise.

146. Substantial injustice can only be avoided by enforcing the promises made by Defendants, CRL and Ms. Jackson to Ms. Powers.

147. Defendant CRL's breach of contract was a direct and proximate cause of the injuries, damages and harm suffered by Ms. Powers and as set forth herein.

148. Defendant CRL and Susan Jackson's conduct was willful and wanton, and Ms. Powers is entitled to punitive/exemplary damages in addition to compensatory damages and other remedies available under the common law.


WHEREFORE, Plaintiff Julie Powers respectfully requests that this Honorable Court grant the following remedies against Defendants CRL and Susan Jackson:

    E.  Award Plaintiff all lost wages, past and future, to which she is entitled;

    F.  Award Plaintiff compensatory damages;

    G.  Award Plaintiff reasonable attorney fees, costs and interest; and

    H.  Award such other relief as this Court deems just and proper.


# COUNT V: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AS TO ALL DEFENDANTS

149. Ms. Powers incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as though set forth at length herein.

150. Defendants' conduct as outlined above was intentional or reckless.

151. At all relevant times, CRL had knowledge of complaints made by former employees in regard to Dr. Romero's behavior. Despite said knowledge, CRL ignored the evidence and conducted a frivolous, lengthy investigation, despite the existing conflicts of interest.

152. As set forth herein, during her employment with CRL, Dr. Romero subjected Ms. Powers to a pattern of discrimination, verbal abuse and hostile work environment.

153. Dr. Romero is a licensed physician and bound by the Hippocratic Oath to "first do no harm" and legally obligated to adhere to the American Medical Association's (AMA) standards articulated in the AMA's Professional Code of Conduct and Ethics, a duty that extends not only patients but to society as a whole, including employees and the general public.

154. As a physician, Dr. Romero is well versed in the adverse psychological/emotional, cognitive and physical effects of chronic stress induced by longterm exposure to abuse in an asymmetrical power relationship.

155. Dr. Romero, with full knowledge, aforethought and intent, purposefully initiated a systematic regiment of abuse toward Ms. Powers so severe that Ms. Powers would either leave her job or render her unable to perform in her job and be grounds for dismissal.

156. Defendants' conduct as outlined above was extreme, outrageous, and beyond all possible bounds of decency, and of such character as to be intolerable in a civilized society.

157. Defendants' conduct was not for any proper purpose, nor was it within the scope of Defendants' authority.

158. Defendants' conduct caused the severe and serious emotional distress of Plaintiff.

159. Defendants' conduct in this matter, which proximately caused Ms. Powers' injuries and

damages, was grossly negligent because it was so reckless that it demonstrated a substantial lack of concern for Ms. Powers' physical and emotional well-being.

160. As a further direct and proximate result of Defendants' wrongful acts, Ms. Powers has sustained injuries and damages including but not limited to: loss of earnings and earning capacity; loss of career opportunities; loss of fringe and pension benefits; mental anguish; physical and emotional distress; humiliation and embarrassment; loss of professional reputation; and loss of the ordinary pleasures of everyday life, including the right to pursue gainful employment of her choice.

WHEREFORE, Plaintiff Julie Powers respectfully requests that this Honorable Court grant the following remedies against Defendants CRL, Susan Jackson, and Roberto Romero:

    A.  Award Plaintiff compensatory damages;

    B.  Award Plaintiff punitive damages;

    C.  Award Plaintiff reasonable attorney fees, costs and interest; and

    D.  Award such other relief as this Court deems just and proper.

## ADDITIONAL PARTIES AND/OR CLAIMS

161. Ms. Powers has subsequently reported Dr. Romero to his superiors at NIH, who launched multiple investigations into Dr. Romero's behavior involving the hostile work environment, age discrimination and harassment claims, and other government violations, as well as CRL's investigation into Ms. Powers' claims and issues of non-compliance.

162. Ms. Powers' claims have been investigated at multiple levels within the Office of the Director at the National Institutes of Health.

163. Ms. Powers' specific claims of Hostile Work Environment, Harassment, Age Discrimination and Retaliation against all defendants have been investigated by an Independent Contractor, hired by the NIH, and are the subject of an official Report of Investigation currently being reviewed by the NIH.

164. It is with knowledge and/or belief that the Report of Investigation found Ms. Powers claims substantive with regard to all Defendants.

165. Ms. Powers has been unable to obtain the Report of Investigation from the NIH due to ongoing investigations regarding Defendants.

166. Ms. Powers respectfully requests leave to amend her Complaint to add additional parties and/or claims upon completing initial discovery.

Respectfully submitted

Dated: August 4, 2016                    By: _Julie Powers_
                                              Julie Powers

# Exhibit B

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

JULIE POWERS, in PRO PER,

      Plaintiff,                                No. 16-009848-CD

-vs-                                      Hon. Daniel A. Hathaway

CHARLES RIVER LABORATORIES
SUSAN JACKSON, individually and in her official capacity
ROBERTO ROMERO, individually and in his official capacity,

      Defendants, jointly and severally.

| | |
|---|---|
| Julie Powers<br>367 Moross Road<br>Grosse Pointe Farms, MI 48236<br>*In Pro Per* | Emily M. Petroski (P63336)<br>JACKSON LEWIS P.C.<br>2000 Town Center, Suite 1650<br>Southfield, MI 48075<br>248-936-1900<br>petroske@jacksonlewis.com<br><br>*Attorneys for Charles River Laboratories and Susan Jackson* |

## AFFIDAVIT OF SUSAN JACKSON

STATE OF MARYLAND   )
                         ) ss
COUNTY OF FREDERICK  )

      I, Susan Jackson, first being duly sworn on oath, state that I have personal knowledge of the matters set forth herein, and am competent to testify to such if called upon to do so.

      1.      I have been employed by Charles River Laboratories, Inc. ("CRL") since 2001, and am currently employed as the Divisional Director, HR Insourcing Solutions.

      2.      CRL is a premier global provider of products and related services designed to assist its clients advance their drug discovery and development businesses.

3.     As the Divisional Director, HR Insourcing Solutions, I have access to information and records concerning current and former employees, including but not limited to Julie Powers.

4.     Ms. Powers was an employee of CRL's Insourcing Solutions ("IS") business unit.

5.     The IS business provides scientific, veterinary and animal husbandry professionals to CRL's customers to assist with or to fully operate the customers' animal research programs.

6.     CRL's customers include leading pharmaceutical and biotechnology companies, federal government agencies and academic institutions.  For example, Wayne State University ("University") has contracted with the National Institute of Health ("NIH") to provide staff to assist the University's Principal Investigators, who are running individual scientific research studies at the University. As a client of the NIH, CRL provided employees (including Ms. Powers) to the NIH at the University.

7.     Ms. Powers began working for Pathology Associates International ("PAI"), a subsidiary of Science Applications International Corporation ("SAIC") on or about September 24, 1997, as an Administrative Assistant.  (See Exhibit 1).  CRL acquired PAI on or about January 8, 2001.

8.     At the time CRL acquired PAI, it also acquired PAI's employees, including Ms. Powers.  As an acquired employee, Ms. Powers was not required to complete an application for employment with CRL, or to execute CRL's new hire paperwork or documentation.  Rather the documentation which Ms. Powers executed at the time of her hire as an employee of PAI, a subsidiary of SAIC, was placed into her CRL personnel file.

2

9.      Ms. Powers' CRL personnel file contains a Mutual Agreement to Arbitrate Claims which she signed on September 26, 1997.  A copy of the Agreement signed by Ms. Powers is attached hereto as Exhibit 2.

10.     On December 19, 2013, Ms. Powers commenced a medical leave.  At no time after December 19, 2013 did Ms. Powers return to work or perform any work for CRL.

11.     Ms. Power's employment with CRL was terminated effective February 9, 2015.

Further affiant sayeth not.

_____
SUSAN JACKSON


Subscribed and sworn to before me
this _31_ day of _August_ 2016.

_____
Notary Public


Harry L. Price
NOTARY PUBLIC
Frederick County
State of Maryland
My Commission Expires
December 7, 2017

# Exhibit 1

**PAI**  ***Pathology Associates International***
*A Company of Science Applications International Corporation*

**SAIC**
*An Employee-Owned Company*

September 21, 1997

Dear Ms. Powers:

Based on your interview and discussions with Pathology Associates International staff members, I am pleased to offer you a position as *Admin. Asst. II* with Pathology Associates International, a subsidiary of Science Applications International Corporation (SAIC). This position working on the NICHD and Animal Care Research Support Contract will begin on Wednesday, September 24, 1997. The salary/hourly rate for this position is *13.23/hr.*

SAIC's commitment to technical leadership, quality, ethics and employee ownership, combined with our extraordinary range of technologies, has made SAIC the largest employee-owned R&D company in the nation. It is our intention to foster an environment conducive to challenge and opportunity. In turn, your employment should enhance our professional capabilities and contribute to the growth and success of the company.

As an employee of PAI, you will be eligible to receive the fringe benefit package as outlined in your interview and described in detail in the documents which will be provided to you. PAI's fringe benefits package includes the following:

1) Two weeks paid vacation per year.
2) Seven days of sick leave.
3) Immediate eligibility to participate in PAI's cafeteria benefits plan which includes medical, dental, life, disability, and flexible spending accounts.
4) Eligibility to participate in PAI's 401(K) plan; the Company matches 35%-50% of employee's contributions up to 5% of salary.
5) Eligibility to participate in SAIC's Employee Stock Purchase Plan.
6) Tuition Assistance ($1200 per year).

Your employment is contingent upon the following documents being completed and signed when you begin work:

Invention, Copyright and Confidentiality Agreement
Education Summary and Pre-Employment Statement
Mutual Agreement to Arbitrate Claims

SAIC has a strong policy against employee use of illegal drugs and substance abuse. As discussed, your continued employment is contingent upon your successfully passing a medical laboratory screen for illegal drugs. It is important that you call Medical Access Laboratory in Germantown, MD (301) 428-1070 and set up an appointment for the screening as soon as possible (authorization forms/instructions attached). Although the

1

use of illegal drugs or substances can be cause for termination should you become employed by PAI, it is understood that your employment is "at will" -- you or the Company may terminate this employment relationship at any time with or without cause or notice.

A criminal background investigation will be conducted on you within the next eight weeks.  Findings more sufficient than misdemeanor traffic violations may be grounds for termination of employment.  In addition, any employee identified for potential hazardous material exposure, will be required to satisfactory pass a standard NIH identified occupational employment health physical.

By signing   a copy of this letter, you are agreeing that as a condition of your employment, you will not disclose information about the work you will be performing on this contract to anyone outside of the organization.  This clause refers specifically, but not limited to animal rights organizations.

We look forward to a mutually rewarding association.  Should you have any questions, feel free to call Stacy Allwein, Human Resources, at (301) 624-2900.

Sincerely,

PATHOLOGY ASSOCIATES INTERNATIONAL
(A SUBSIDIARY OF SCIENCE APPLICATIONS INTERNATIONAL CORPORATION)

-------------------------------------------------------------------------------------------------------

I accept the terms and conditions of this employment offer.


_____                _____
            Signature                                               Date
                                                                    9/20/97

2

# Exhibit 2

**Mutual Agreement to Arbitrate Claims**



Science Applications International Corporation ("SAIC") and the undersigned ("Employee") have entered into this Mutual Agreement to Arbitrate Claims (the "Agreement") in order to establish and gain the benefits of a timely, impartial and cost-effective dispute resolution procedure. Any reference in the Agreement to SAIC will also be a reference to all subsidiaries and affiliated corporations, all benefit plans, the benefit plans' administrators, fiduciaries, affiliates, and the successors and assigns of any of them.

1. **Claims Covered by the Agreement:** SAIC and Employee will settle by arbitration all statutory, contractual and/or common law claims or controversies ("claims") that SAIC may have against Employee, or that Employee may have against SAIC or any of its officers, directors, employees or agents in their capacity as such or otherwise. Claims subject to arbitration include (i) claims for discrimination (including, but not limited to, age, disability, marital status, medical condition, national origin, race, retaliation, sex, sexual harassment or sexual orientation); (ii) claims for breach of any contract or covenant (express or implied); (iii) claims for violation of any federal, state or other governmental law, statute, regulation or ordinance; and (iv) tort claims (including, but not limited to, negligent or intentional injury, defamation and termination of employment in violation of public policy).

2. **Claims Not Covered by the Agreement:** The Agreement, however, will not apply to (i) claims by Employee for workers' compensation or unemployment insurance (an exclusive government created remedy exists for these claims); (ii) claims which even in the absence of the Agreement could not have been litigated in court or before any administrative proceeding under applicable federal, state or local law; and (iii) claims by SAIC for injunctive and/or other equitable relief (remedies requiring a court's rapid injunctive power).

3. **Required Notice of Claims and Statute of Limitations:** Arbitration shall be initiated by serving or mailing a written notice to the other party within one year of the date the complaining party first has knowledge of the event first giving rise to the claim. If the claim is not properly submitted in this time frame, all rights and claims that the complaining party has or may have had against the other party shall be waived and void, even if there is a federal or state statute of limitations which would have given the complaining party more time to pursue the claims. Any notice to be sent to Employee may be delivered to the most recent address listed in Employee's personnel files at SAIC. Any notice to be sent to SAIC shall be delivered to a Corporate Regional Human Resources Director of SAIC. The notice shall identify and describe the nature of all claims asserted and the facts upon which such claims are based.

4. **Arbitration Procedures:** Except as specifically provided herein, the arbitration will be conducted according to the SAIC Employment Arbitration Rules and Procedures (the "Arbitration Procedures"). These rules and procedures are included in the SAIC Employee Dispute Resolution Guide as Attachment C and incorporated herein by this reference.

5. **Representation and Arbitrator Fees and Costs:** Each party may be represented in the arbitration by an attorney or other representative selected by the party. Each party shall be responsible for its own attorneys' or representatives' fees, if any. However, if any party prevails on a statutory claim which affords the prevailing party attorneys' fees, the arbitrator may award reasonable attorneys' fees to the prevailing party. If Employee initiates the arbitration, Employee shall deliver to SAIC with the written notice of arbitration a check payable to the American Arbitration Association ("AAA"), in an amount equal to fifty percent (50%) of the applicable, then current AAA filing fee. SAIC shall pay the balance of the AAA filing fee and all other fees, costs and expenses of the arbitrator and AAA for administering the arbitration.

**Mutual Agreement to Arbitrate Claims** 

6. **Exclusive Remedy:** Employee understands that Employee is waiving the right to seek remedies in court, including the right to a jury trial.

7. **Construction:** Should any portion of the Agreement be found to be unenforceable, such portion will be severed from the Agreement, and the remaining portions shall continue to be enforceable.

8. **Sole and Entire Agreement:** The Agreement expresses the entire agreement of the parties and there are no other agreements, oral or written, concerning arbitration, except as provided herein. The Agreement is not, and shall not be construed to create, any contract of employment, express or implied and either party, without the other's consent, may terminate the employment relationship at any time for any reason with or without cause or notice. The Agreement cannot be modified except in a writing signed by Employee and the Senior Vice President for Administration of SAIC.

9. **Voluntary Execution:** EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS CAREFULLY READ THE AGREEMENT AND UNDERSTANDS ITS TERMS. EMPLOYEE AGREES THAT ALL UNDERSTANDINGS AND AGREEMENTS BETWEEN SAIC AND EMPLOYEE RELATING TO THE SUBJECTS COVERED IN THE AGREEMENT ARE CONTAINED IN IT. EMPLOYEE HAS VOLUNTARILY ENTERED INTO THE AGREEMENT WITHOUT RELIANCE ON ANY PROVISION OR REPRESENTATION BY SAIC OTHER THAN THOSE CONTAINED IN THE AGREEMENT AND HAS HAD AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, TO THE EXTENT DESIRED, BEFORE EXECUTING THE AGREEMENT.

**EMPLOYEE**

**SCIENCE APPLICATIONS
INTERNATIONAL CORPORATION**

_Julie Powers_
Employee's Name

_B. L. Theule_

_Julie A. Powers_
Employee's Signature

B.L. Theule, Corporate Vice President
Human Resources

_9/26/97_
Dated

Arbitrate.Agm
1-31-94

B-2

# Exhibit C

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 471-2015-02786 |

| Michigan Department Of Civil Rights | and EEOC |
|---|---|

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)*<br>**Julie Powers** | Home Phone *(Incl. Area Code)*<br>**(313) 231-2157** | Date of Birth<br>**07-01-1959** |
|---|---|---|

Street Address                                      City, State and ZIP Code
**367 Moross Rd, Grosse Pointe Farms, MI 48236**

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name<br>**CHARLES RIVER LABORATORIES** | No. Employees, Members<br>**500 or More** | Phone No. *(Include Area Code)*<br>**(240) 529-0700** |
|---|---|---|

Street Address                                      City, State and ZIP Code
**251 Ballardvale St,  Wilmington, MA 01887**

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|

Street Address                                      City, State and ZIP Code

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **02-09-2015**     Latest **02-09-2015**

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I began working for the above named employer in September 1997. I was assigned to work at Perinatology Research Branch in Detroit, Michigan.

On November 7, 2014, I verbally complained to Division Director over the telephone about my Branch Chief subjecting me to harassment and age discrimination when he demoted me in April 2013 and replaced me with a younger individual in her 20's.

On February 9, 2015, I was terminated. No reason was given for the termination. I did not learn of my termination until March 16, 2015 when I also learned that my complaint could not be substantiated.

I believe that I was terminated in retaliation for complaining of a protected activity in violation of the Age Discrimination in Employment Act of 1967, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |

| Jul 21, 2015<br>Date | X *Julie A Powers*<br>Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)*<br>7/21/15 |
|---|---|---|

# Exhibit D

**Mutual Agreement to Arbitrate Claims**



Science Applications International Corporation ("SAIC") and the undersigned ("Employee") have entered into this Mutual Agreement to Arbitrate Claims (the "Agreement") in order to establish and gain the benefits of a timely, impartial and cost-effective dispute resolution procedure. Any reference in the Agreement to SAIC will also be a reference to all subsidiaries and affiliated corporations, all benefit plans, the benefit plans' administrators, fiduciaries, affiliates, and the successors and assigns of any of them.

1. **Claims Covered by the Agreement:** SAIC and Employee will settle by arbitration all statutory, contractual and/or common law claims or controversies ("claims") that SAIC may have against Employee, or that Employee may have against SAIC or any of its officers, directors, employees or agents in their capacity as such or otherwise. Claims subject to arbitration include (i) claims for discrimination (including, but not limited to, age, disability, marital status, medical condition, national origin, race, retaliation, sex, sexual harassment or sexual orientation); (ii) claims for breach of any contract or covenant (express or implied); (iii) claims for violation of any federal, state or other governmental law, statute, regulation or ordinance; and (iv) tort claims (including, but not limited to, negligent or intentional injury, defamation and termination of employment in violation of public policy).

2. **Claims Not Covered by the Agreement:** The Agreement, however, will not apply to (i) claims by Employee for workers' compensation or unemployment insurance (an exclusive government created remedy exists for these claims); (ii) claims which even in the absence of the Agreement could not have been litigated in court or before any administrative proceeding under applicable federal, state or local law; and (iii) claims by SAIC for injunctive and/or other equitable relief (remedies requiring a court's rapid injunctive power).

3. **Required Notice of Claims and Statute of Limitations:** Arbitration shall be initiated by serving or mailing a written notice to the other party within one year of the date the complaining party first has knowledge of the event first giving rise to the claim. If the claim is not properly submitted in this time frame, all rights and claims that the complaining party has or may have had against the other party shall be waived and void, even if there is a federal or state statute of limitations which would have given the complaining party more time to pursue the claims. Any notice to be sent to Employee may be delivered to the most recent address listed in Employee's personnel files at SAIC. Any notice to be sent to SAIC shall be delivered to a Corporate Regional Human Resources Director of SAIC. The notice shall identify and describe the nature of all claims asserted and the facts upon which such claims are based.

4. **Arbitration Procedures:** Except as specifically provided herein, the arbitration will be conducted according to the SAIC Employment Arbitration Rules and Procedures (the "Arbitration Procedures"). These rules and procedures are included in the SAIC Employee Dispute Resolution Guide as Attachment C and incorporated herein by this reference.

5. **Representation and Arbitrator Fees and Costs:** Each party may be represented in the arbitration by an attorney or other representative selected by the party. Each party shall be responsible for its own attorneys' or representatives' fees, if any. However, if any party prevails on a statutory claim which affords the prevailing party attorneys' fees, the arbitrator may award reasonable attorneys' fees to the prevailing party. If Employee initiates the arbitration, Employee shall deliver to SAIC with the written notice of arbitration a check payable to the American Arbitration Association ("AAA"), in an amount equal to fifty percent (50%) of the applicable, then current AAA filing fee. SAIC shall pay the balance of the AAA filing fee and all other fees, costs and expenses of the arbitrator and AAA for administering the arbitration.

**Mutual Agreement to Arbitrate Claims**



6. **Exclusive Remedy:** Employee understands that Employee is waiving the right to seek remedies in court, including the right to a jury trial.

7. **Construction:** Should any portion of the Agreement be found to be unenforceable, such portion will be severed from the Agreement, and the remaining portions shall continue to be enforceable.

8. **Sole and Entire Agreement:** The Agreement expresses the entire agreement of the parties and there are no other agreements, oral or written, concerning arbitration, except as provided herein. The Agreement is not, and shall not be construed to create, any contract of employment, express or implied and either party, without the other's consent, may terminate the employment relationship at any time for any reason with or without cause or notice. The Agreement cannot be modified except in a writing signed by Employee and the Senior Vice President for Administration of SAIC.

9. **Voluntary Execution:** EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS CAREFULLY READ THE AGREEMENT AND UNDERSTANDS ITS TERMS. EMPLOYEE AGREES THAT ALL UNDERSTANDINGS AND AGREEMENTS BETWEEN SAIC AND EMPLOYEE RELATING TO THE SUBJECTS COVERED IN THE AGREEMENT ARE CONTAINED IN IT. EMPLOYEE HAS VOLUNTARILY ENTERED INTO THE AGREEMENT WITHOUT RELIANCE ON ANY PROVISION OR REPRESENTATION BY SAIC OTHER THAN THOSE CONTAINED IN THE AGREEMENT AND HAS HAD AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, TO THE EXTENT DESIRED, BEFORE EXECUTING THE AGREEMENT.

**EMPLOYEE**

_Julie Powers_
Employee's Name

_Julie A. Powers_
Employee's Signature

_9/26/97_
Dated

**SCIENCE APPLICATIONS INTERNATIONAL CORPORATION**

_B. L. Theule_

B.L. Theule, Corporate Vice President
Human Resources

Arbitrate.Agm
1-31-94

B-2

# Exhibit E



Positive
As of: September 1, 2016 11:12 AM EDT

# BREITENBECK v. MERILLAT INDUS.

Court of Appeals of Michigan

April 4, 2006, Decided

No. 258135

**Reporter**
2006 Mich. App. LEXIS 929; 2006 WL 859421

SHARON BREITENBECK, Plaintiff-Appellant, v MERILLAT INDUSTRIES, L.L.C., Defendant-Appellee.

**Notice:** [*1] THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Prior History:** Wayne Circuit Court. LC No. 03-340708-NZ.

**Disposition:** Affirmed.

## Core Terms

parties, arbitrate, mutuality, employment application, summary disposition, enforceable, agreement to arbitrate, meeting of the minds, legal consideration, contract provision, limitations period, valid contract, public policy, time period, trial court, shortened, signing, issues, rights

**Judges:** Before: Neff, P.J., and Saad and Bandstra, JJ.

## Opinion

PER CURIAM.

Plaintiff appeals the order granting summary disposition in favor of defendant in this action brought pursuant to the Family and Medical leave Act ('FMLA"), 29 USC 2601 *et seq.* We affirm. This case is being decided without oral argument pursuant to MCR 7.214(E).

The two issues here are whether the employment application plaintiff signed (1) constitutes an enforceable agreement to arbitrate any claims against defendant and, (2) shortens the time period in which she could bring her claims. The trial court answered yes to both issues and thus granted summary disposition pursuant to MCR 2.116(C)(7). This Court reviews a trial court's grant of a motion for summary disposition under MCR 2.116(C)(7) de novo to determine whether the moving party was entitled to judgment as a matter of law. *Watts v Polaczyk*, 242 Mich App 600, 603; [*2] 619 N.W.2d 714 (2000). In reviewing a motion under MCR 2.116(C)(7), this Court accepts as true the plaintiff's well-pleaded allegations and construes them in the plaintiff's favor. *Watts, supra* at 603. We must also consider the pleadings, affidavits, depositions, admissions, and documentary evidence filed or submitted by the parties. *Watts supra* at 603.

Predispute agreements to arbitrate statutory claims are not against public policy and are enforceable. *Arslanian v Oakwood United Hospitals, Inc*, 240 Mich. App. 540, 543; 618 N.W.2d 380 (2000). Such agreements are

valid if: (1) the parties have agreed to arbitrate the claims (there must be a valid, binding, contract covering the claims), (2) the relevant statute does not prohibit such agreements, and (3) the arbitration agreement does not waive the substantive rights and remedies of the statute and the arbitration procedures are fair so that the employee may effectively vindicate her statutory rights. *Rembert v Ryan's Family Steak Houses, Inc*, 235 Mich. App. 118, 156; 596 N.W.2d 208 (1999).

Parties may also contract [*3] for a period of limitations shorter than the applicable statute of limitations provided by law. *Timko v Oakwood Custom Coating, Inc*, 244 Mich. App. 234, 239; 625 N.W.2d 101 (2001). Until recently, the general rule permitted contractual limitation of action provisions, but only if the time limitation was reasonable. However, in *Rory v Continental Ins, Co*, 473 Mich. 457; 703 N.W.2d (2005), our Supreme Court overruled the reasonableness rule. The Court held that an unambiguous contractual provision providing for a shortened period of limitations is to be enforced as written unless the provision would violate law or public policy. A mere judicial assessment of "reasonableness" is an invalid basis upon which to refuse to enforce contractual provisions. *Rory, supra* at 470.

Here, plaintiff challenges the agreement to arbitrate her claims and the limited time period for bringing claims. The trial court held that the employment application is a valid and enforceable contract. The elements of a valid contract are (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, [*4] and (5) mutuality of obligation. *Thomas v Leja*, 187 Mich. App. 418, 422; 468 N.W.2d 58 (1991).

Plaintiff does not dispute that the first two elements of a valid contract are present. However, plaintiff claims there is no legal consideration. To have consideration there must be a bargained-for exchange. *General Motors Corp v Dept of Treasury, Revenue Division*, 466 Mich. 231, 238; 644 N.W.2d 734 (2002). There must be a "benefit on one side or a detriment suffered, or service done on the other." *General Motors Corp, supra* at 238-239. Courts do not generally inquire into the sufficiency of consideration. *General Motors Corp, supra* at 239.

Mutuality of agreement refers to a "meeting of the minds" on all material terms of the contract. *Marlo Beauty Supply, Inc v Farmers Ins Group of Cos*, 227 Mich. App. 309, 317; 575 NW2d 324 (1998), modified on other grounds by *Hart v Farmers Ins Exch*, 461 Mich. 1 (1999). However, whether there has been "a meeting of the minds is judged by an objective standard, looking at the express words of the parties and their [*5] visible acts, not their subjective states of mind." *Marlo Beauty Supply, Inc, supra* at 317. Here, plaintiff signed the employment application. It is a well-established principle that a party signing an agreement is deemed to know its contents and may not claim ignorance to avoid the instrument. *Scholz v Montogomery Ward & Co, Inc*, 437 Mich. 83, 92; 468 N.W.2d 845 (1991). By signing the application, plaintiff manifested an intent to be bound by its terms. We conclude that there was mutuality of agreement in this case.

Affirmed.

/s/ Janet T. Neff

/s/ Henry William Saad

/s/ Richard A. Bandstra



 Positive
As of: September 1, 2016 11:12 AM EDT

# Dedivanaj v. DaimlerChrysler Corp.

Court of Appeals of Michigan

June 21, 2007, Decided

No. 266769

**Reporter**
2007 Mich. App. LEXIS 1650; 2007 WL 1791709

GJUSTA DEDIVANAJ, Plaintiff-Appellant, v DAIMLERCHRYSLER CORPORATION, Defendant-Appellee.

**Notice:** THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Prior History:** [*1] Wayne Circuit Court. LC No. 02-236947-CZ.

**Disposition:** Affirmed.

## Core Terms

limitations period, trial court, continuing violation doctrine, sexual harassment, directed verdict, motion in limine, damages

**Judges:** Before: White, P.J., and Saad and Murray, JJ.

## Opinion

PER CURIAM.

Plaintiff appeals the trial court's grant of DaimlerChrysler's motion in limine and motion for directed verdict on her claims of sexual harassment and race association discrimination. For the reasons set forth in this opinion, we affirm.

I. Limitations Period

When plaintiff first applied for employment at DaimlerChrysler in 1995, she signed an employment application that contained the following provision:

> I agree that any claim or lawsuit relating to my service with Chrysler Corporation or any of its subsidiaries must be filed no more than six (6) months after the date of the employment action that is the subject of the claim or lawsuit. I waive any statute of limitations to the contrary.

Plaintiff argues that the trial court should not have enforced the provision and, instead, should have allowed her to present evidence of sexual harassment and race association discrimination outside the limitations period. [1]

In its motion in limine, DaimlerChrysler argued that the limitations period is valid and enforceable and asked the trial court to exclude evidence outside the six-month

---

[1] This Court reviews de novo the legal question of whether a statute of limitations bars a cause of action. *Colbert v Conybeare Law Office,* 239 Mich App 608, 613-614; 609 NW2d 208 (2000). [*2] This Court reviews a trial court's decision to admit or exclude evidence for an abuse of discretion. *Chmielewski v Xernmac, Inc,* 457 Mich 593, 614; 580 NW2d 817 (1998).

period. Because plaintiff filed her complaint on October 17, 2002, DaimlerChrysler argued that the cut off date for her claims should be April 17, 2002.

The outcome of this issue is controlled by this Court's decision in *Clark v DaimlerChrysler*, 268 Mich App 138; 706 NW2d 471 (2005). The plaintiff in *Clark* raised the same arguments about precisely the same employment application provision, and this Court rejected each argument. The Court ruled that, because the language in the employment application is not ambiguous, the term must be enforced "as written unless it is contrary to law or public policy, or is otherwise unenforceable under recognized traditional contract defenses," including duress, waiver, estoppel, fraud, or unconscionability. *Id.* at 142.

Here, as in *Clark*, the plain language of the provision states that an employee must file any claim or  [*3] lawsuit within six months of the action giving rise to the claim. While plaintiff asserts that the term "claim" is ambiguous, DaimlerChrysler is correct that, regardless whether it may apply to other internal complaints, plaintiff was, at the very least, required to file her *lawsuit* within six months of when the alleged wrong occurred. Because she filed her complaint on October 17, 2002, her cut-off date was April 17, 2002 and any actions that arose prior to that date are untimely under the plain language of the agreement. [2] Accordingly, the trial court

---

[2] In *Clark*, this Court also held that the same limitations provision is not contrary to public policy. The Court explained:

Michigan has no general policy or statutory enactment prohibiting the contractual modification of the periods of limitations provided by statute. *Rory, supra* at 471. Likewise, even before *Rory,* provisions within an employment contract providing for a shortened period of limitations were

correctly ruled that the six month limitations period is valid and enforceable.

II. Continuing Violations Doctrine

Plaintiff further claims that the trial court erred when it refused to apply the continuing violations doctrine to allow the jury to consider claims that fell outside the limitations period.

Plaintiff incorrectly claims that the trial court waited until plaintiff presented four days of evidence at trial to apply the holding in *Garg v Macomb Co Community Mental Health Services,* 472 Mich 263, 284-285; 696 NW2d 646,  [*5] amended 473 Mich 1205 (2005), in which our Supreme Court abrogated the continuing violations doctrine. Indeed, plaintiff claims that she would have presented different evidence if the trial court had ruled on the continuing violations doctrine before trial. At the motion in limine hearing on September 23, 2005, DaimlerChrysler's counsel specifically

---

held to be reasonable and, therefore, valid and enforceable. See *Timko v Oakwood Custom Coating, Inc,* 244 Mich App 234, 240-244; 625 NW2d 101 (2001). Consequently,  [*4] we are unable to conclude that the limitations period provided in the contract violates public policy.

Like plaintiff here, the plaintiff in *Clark* argued that the employment application is an adhesion contract. Once again, the Court in *Clark* rejected this argument and opined that, pursuant to *Rory v Continental Ins Co,* 473 Mich 457; 703 NW2d 23 (2005), this Court "may not consider whether the contract was one of adhesion when determining whether the modified period of limitations was unconscionable." *Clark, supra* at 143. Further, as in *Clark*, plaintiff failed to present any evidence that she had no realistic alternative to employment with DaimlerChrysler. *Clark, supra* at 143-144. Moreover, the *Clark* Court concluded that the six month limitations period is not inherently unreasonable and it does not shock the conscience. *Id.*

argued that the Court in *Garg* eliminated the continuing violations doctrine and the trial court agreed that plaintiff may only recover damages for conduct that occurred within the six month statute of limitations period. Moreover, plaintiff's counsel conceded at oral argument that *Garg* applies to preclude recovery for conduct that occurred outside the six month statute of limitations period. Though plaintiff's counsel asserted in his brief in response to DaimlerChrysler's motion in limine that the continuing violations doctrine should apply, he changed his argument after DaimlerChrysler pressed the applicability of *Garg*. [3] Indeed, at the motion hearing, the following exchange occurred:

> *Trial Court.* And I certainly understand defendant's position in this case, but it seems to me that plaintiff is only seeking damages, can only seek damages [*6] for conduct that occurred in this case, within the 6 month period of the statute of limitations. It cannot obtain damages for acts that occurred prior to the 6 months.

> *Plaintiff's Counsel.* That's correct.

Plaintiff's counsel agreed that *Garg* controls whether plaintiff may recover for untimely claims and "[a] party who expressly agrees with an issue in the trial court cannot then take a contrary position on appeal." *Grant v AAA Michigan/Wisconsin, Inc (On Remand)*, 272 Mich App 142, 148; 724 NW2d 498 (2006). Here, plaintiff did not argue that *Garg* should be applied prospectively only and plaintiff's counsel expressly agreed with the trial court

that *Garg* applies and that plaintiff may not recover damages for conduct that fell outside the six month limitations period. [4] Accordingly, plaintiff may not claim error on appeal for the trial court's application of *Garg* during DaimlerChrysler's motion in limine.

At the hearing on DaimlerChrysler's motion for directed verdict, [5] plaintiff's counsel declined to take the position that *Garg* is inapplicable, but instead argued that evidence established that sexual harassment and race association discrimination also occurred after limitations cutoff date. The flaw in plaintiff's argument is that, viewing the evidence in a light most favorable to plaintiff, plaintiff failed to present evidence that sexual harassment or race association discrimination occurred after April 17, 2002. Accordingly, the trial court correctly granted DaimlerChrysler's motion for directed verdict and dismissed plaintiff's sexual harassment and race association claims.

Affirmed.

--------

[4] Indeed, the only argument plaintiff's counsel raised on this issue at the motion hearing was whether he may present untimely evidence as *background* information for the jury. The trial court granted counsel's request and the vast majority of evidence he presented on behalf of plaintiff occurred prior to the limitations cutoff date of April 17, 2002.

[5] As this Court explained in *Dykema Gossett PLLC v Ajluni*, 273 Mich App 1, 11; 730 NW2d 29 (2006):

> This Court reviews de novo the grant or denial of a motion [*8] for a directed verdict. The trial court must consider the evidence in the light most favorable to the nonmoving party and make all reasonable inferences in favor of the nonmoving party; a directed verdict is proper only when no factual question exists upon which reasonable minds may differ.

--------

[3] Though plaintiff's appellate counsel asserts that DaimlerChrysler should have raised the issue of *Garg* earlier because the opinion was released on May 11, 2005, her trial counsel stated on the record that DaimlerChrysler's attorney sent him a copy of the *Garg* opinion on the day it was [*7] released.

/s/ Helene N. White                                    /s/ Christopher M. Murray

/s/ Henry William Saad

---

**End of Document**



No *Shepard's* Signal™
As of: September 1, 2016 11:12 AM EDT

## Guilder v. Pontiac Osteopathic Hosp.

Court of Appeals of Michigan

November 22, 2011, Decided

No. 298719

**Reporter**
2011 Mich. App. LEXIS 2074; 2011 WL 5866986

ANTOINE GUILDER, Plaintiff-Appellant, v PONTIAC OSTEOPATHIC HOSPITAL, KALLIE MOSHIER, and UNITED SOLAR OVONIC, Defendants-Appellees, and DAVID MESSINA, Defendant.

**Notice:** THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Prior History:** [*1] Oakland Circuit Court. LC No. 2010-107234-CD.

## Core Terms

summary disposition, contractual limitations period, employment agreement, limitations period, plaintiff's claim, contractual

**Judges:** Before: MURPHY, C.J., and BECKERING and RONAYNE KRAUSE, JJ.

## Opinion

Per Curiam.

Plaintiff appeals as of right the trial court's orders granting summary disposition in favor of defendants pursuant to MCR 2.116(C)(7). We affirm.

Plaintiff alleged that he was terminated from his employment with defendant United Solar Ovonic ("USO") in June 2008 on the basis of a false report that he altered a drug test administered by defendants Pontiac Osteopathic Hospital ("POH") and Kallie Moshier. Plaintiff filed this action in January 2010, asserting claims for (1) race discrimination under Michigan's Civil Rights Act (CRA), MCL 37.2101 *et seq.*, (2) discrimination under the Persons with Disabilities Civil Rights Act (PWDCRA), MCL 37.1101 *et seq.*, (3) "wilful and deliberate defacing of a medical record" in violation of MCL 750.429, and (4) intentional infliction of emotional distress.

Defendants POH and Moshier moved for summary disposition under MCR 2.116(C)(7) and (8). USO filed a separate motion for summary disposition under MCR 2.116(C)(7). The trial court granted summary disposition for all defendants, concluding that plaintiff's claims were barred by contractual [*2] limitations periods in employment agreements with USO.

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Grimes v Dep't of Transp*, 475 Mich 72, 76; 715 NW2d 275 (2006). MCR 2.116(C)(7) provides that summary disposition may be granted when a claim is "barred because of [a] . . . statute of limitations[.]" This Court has recognized that MCR 2.116(C)(7) is also the appropriate subrule for analyzing a request for

summary disposition based on a contractual limitations period. *Timko v Oakwood Custom Coating, Inc*, 244 Mich App 234, 238; 625 NW2d 101 (2001). Under MCR 2.116(C)(7), this Court must consider not only the pleadings, but also any affidavits, depositions, admissions, or other documentary evidence filed or submitted by the parties. *Horace v City of Pontiac*, 456 Mich 744, 749; 575 NW2d 762 (1998). The contents of the complaint must be accepted as true unless contradicted by the documentary evidence. *Patterson v Kleiman*, 447 Mich 429, 434 n 6; 526 NW2d 879 (1994). This Court considers the documentary evidence in a light most favorable to the nonmoving party. *Herman v Detroit*, 261 Mich App 141, 143-144; 680 NW2d 71 (2004). If there is no factual [*3] dispute, whether a plaintiff's claim is barred under a principle set forth in MCR 2.116(C)(7) is a question of law for the court to decide. *Huron Tool & Engineering Co v Precision Consulting Servs, Inc*, 209 Mich App 365, 377; 532 NW2d 541 (1995). If a factual dispute exists, however, summary disposition is not appropriate. *Id.*

On appeal, plaintiff argues that summary disposition was inappropriate for reasons unrelated to the contractual limitations period, which was the sole basis for the trial court's decision to grant summary disposition in favor of all defendants. Our review of plaintiff's appellate brief reveals no substantive discussion or analysis with respect to the contractual limitations period. While plaintiff's statement of questions involved perhaps includes an attempt to reference the issue, it is not decipherable, and the matter regarding the contractual limitations period is not subsequently explored or elaborated upon in the brief. Accordingly, the issue is waived due to inadequate briefing, *Mudge v Macomb Co*, 458 Mich 87, 105; 580 NW2d 845 (1998), and we must also affirm for failure to address the basis of the trial court's decision in granting summary disposition in [*4] favor of

defendants, *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 381; 689 NW2d 145 (2004). Furthermore, even on examination of the trial court's ruling, we find no error.

"[A]n unambiguous contractual provision providing for a shortened period of limitations is to be enforced as written unless the provision would violate law or public policy." *Rory v Continental Ins Co*, 473 Mich 457, 470; 703 NW2d 23 (2005). There is no general exception for contractual agreements that shorten the limitations period for bringing a statutory civil rights claim arising out of employment. See *Timko*, 244 Mich App at 240-245 (holding that a contractual six-month limitations period was enforceable as applied to the plaintiff's claim for age discrimination under the CRA).

In this case, plaintiff's employment application with USO contained a one-year limitations period that applied to "any action or claim against [USO] or any employee arising out of [plaintiff's] employment or termination of employment." Plaintiff also signed a separate at-will employment agreement that contained a six-month limitations period. The latter provision applied to "any action or lawsuit, including administrative charges, [*5] against [USO], or any of its employees or agents, arising out of [plaintiff's] employment or termination of employment."

Although plaintiff argues that defendant USO was not entitled to rely on an arbitration provision in the employment agreements because it did not raise an agreement to arbitrate as an affirmative defense, the trial court did not grant summary disposition on the basis of the arbitration provision. Instead, it determined that plaintiff's claims against USO were barred by the contractual limitations periods. Plaintiff does not address the contractual limitations issue. Because contractual provisions that provide for a

shortened limitations period are generally enforceable, plaintiff's complaint was filed beyond the contractual limitations periods in the employment agreements at issue, and because plaintiff has not provided any reason for finding that the provisions should not be enforced, USO was entitled to summary disposition.

We additionally conclude that POH and Moshier were USO's agents who were also entitled to assert the limitations provision in the at-will employment agreement between plaintiff and USO.

The at-will employment agreement between plaintiff and USO [*6] unambiguously provided that the six-month limitations period applied to USO's employees and agents. A third-party beneficiary to a contract "stands in the shoes of the promisee and thus may enforce the contract against the promisor." *White v Taylor Distrib Co, Inc*, 289 Mich App 731, 734; 798 NW2d 354 (2010) (citation and internal quotations omitted). The at-will employment agreement expressly identified USO's agents and employees as designated classes intended to benefit from the six-month limitations provision. *Id*. at 735.

"In agency law, the principal and his agent share a legal identity; it is a fundamental rule that the principal is bound, and liable for, the acts of his agent done with the actual or apparent authority of the principal." *People v Konrad*, 449 Mich 263, 280-281; 536 NW2d 517 (1995); see also *Persinger v Holst*, 248 Mich App 499, 505; 639 NW2d 594 (2001). In determining whether an agency has been created, a court must consider the relations of the parties as they in fact exist under their acts or agreements; in its broadest sense an agency includes every relationship in which one person acts for or represents another by his authority. *St Clair Intermediate Sch Dist v Intermediate Ed Ass'n/Mich Ed Ass'n*, 458 Mich 540, 557; 581 NW2d 707 (1998). [*7] An essential component of an agency relationship is the right of the principal to control, "at least at some point, the conduct and actions of his agent." *Persinger*, 248 Mich App at 504-505. Here, POH acted on USO's behalf by conducting an employment-related drug screen for USO's employee. USO controlled POH's conduct by directing it to perform employee drug screening under conditions that ensured accuracy. As reflected in plaintiff's own complaint, during the course of the drug screening process, nurse Moshier phoned defendant David Messina, USO's human resources director, seeking direction on how she should instruct plaintiff after plaintiff objected to the taking of a second specimen and indicated an intent to leave POH. Moreover, once again, plaintiff fails to engage in any analysis of agency law, nor does he even assert that POH and Moshier were not agents of USO. Accordingly, the trial court properly granted summary disposition for POH and Moshier pursuant to MCR 2.116(C)(7), given that plaintiff's claims were time-barred.

In light of our decision, it is not necessary to address the parties' remaining arguments concerning alternative bases for summary disposition.

Affirmed. Having [*8] fully prevailed on appeal, defendants are awarded costs pursuant to MCR 7.219.

/s/ William B. Murphy

/s/ Jane M. Beckering

/s/ Amy Ronayne Krause



No *Shepard's* Signal™
As of: September 1, 2016 11:12 AM EDT

# Hardy v. St. John Health

Court of Appeals of Michigan

December 15, 2011, Decided

No. 300326

**Reporter**
2011 Mich. App. LEXIS 2236; 2011 WL 6268224

KIMBERLY HARDY, Plaintiff-Appellant, v ST. JOHN HEALTH, Defendant-Appellee.

**Notice:** THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Prior History:** [*1] Macomb Circuit Court. LC No. 2009-005715-CD.

## Core Terms

summary disposition, limitations period, public policy, unconscionability

**Judges:** Before: O'CONNELL, P.J., and MURRAY and DONOFRIO, JJ.

## Opinion

MEMORANDUM.

Plaintiff appeals as of right from a circuit court order granting defendant's motion for summary disposition pursuant to MCR 2.116(C)(7) because plaintiff filed the action more than six months after the termination of her employment, contrary to the limitations period to which she agreed when signing her application for employment. We affirm.

Summary disposition may be granted under MCR 2.116(C)(7) when a claim is time-barred by a contractual provision. *Clark v DaimlerChrysler Corp*, 268 Mich App 138, 140-141; 706 NW2d 471 (2005). This Court reviews a trial court's decision on a motion for summary disposition de novo. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).

Parties may agree to a shortened limitations period, and if the provision is unambiguous, it must be enforced as written unless it violates the law or public policy, or is unenforceable under traditional contract defenses, including unconscionability. *Rory v Continental Ins Co*, 473 Mich 457, 470; 703 NW2d 23 (2005). In *Clark*, 268 Mich App at 142-145, this Court held that a six-month limitations period in an [*2] employment application does not violate public policy and that the plaintiff did not establish that the provision was either procedurally or substantively unconscionable. Plaintiff recognizes that *Clark* controls the disposition of this case, but argues that the dissenting opinion in *Clark* is better-reasoned. We are bound to follow *Clark* and decline plaintiff's invitation to issue a conflict opinion pursuant to MCR 7.215(J)(2).

Affirmed.

/s/ Peter D. O'Connell

/s/ Christopher M. Murray

/s/ Pat M. Donofrio

_____

**End of Document**



No *Shepard's* Signal™
As of: September 1, 2016 11:12 AM EDT

# TOOLANEN v. LEAR CORP.

Court of Appeals of Michigan

January 25, 2007, Decided

No. 272056

**Reporter**
2007 Mich. App. LEXIS 132; 2007 WL 189650

DAVID TOOLANEN and CAROLINE TOOLANEN, Plaintiffs-Appellants, v LEAR CORPORATION, Defendant-Appellee.

**Notice:** [*1] THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Prior History:** Roscommon Circuit Court. LC No. 06-725819-CK.

**Disposition:** Affirmed.

## Core Terms

employment application, evidentiary hearing, personnel file, trial court, limitations, summary disposition

**Judges:** Before: Fort Hood, P.J., and Talbot and Servitto, JJ.

## Opinion

PER CURIAM.

Plaintiffs [1] appeal as of right from the order granting summary disposition for defendant under MCR 2.116(C)(7). We affirm.

Plaintiff was an employee of ITT Automotive when the company was purchased by defendant Lear Corporation. After the purchase, defendant had its employees sign an employment application. This employment application contained the following provision: [*2]

> I FURTHER AGREE NOT TO BRING ANY ACTION OR SUIT RELATING DIRECTLY OR INDIRECTLY TO EMPLOYMENT WITH LEAR CORPORATION, OR THE TERMINATION OF SUCH EMPLOYMENT, MORE THAN ONE (1) YEAR AFTER THE DATE OF TERMINATION OF SUCH EMPLOYMENT AND I WAIVE ANY STATUTES OF LIMITATION TO THE CONTRARY.

Plaintiff signed the application on October 16, 1997. In the summer of 2003, plaintiff was advised that he would be released from his employment due to lack of work. At that time, plaintiff requested and received a copy of his employment file. Plaintiff was not released at that time. On December 22, 2004, plaintiff was discharged from defendant's employ. After his

---

[1] Plaintiffs are husband and wife. Plaintiff Caroline Toolanen's claims are strictly derivative of her husband's claims. Consequently, the singular term "plaintiff" refers to David Toolanen only. Because we conclude that dismissal of plaintiff's claim was proper, the dismissal of Caroline's claim was also proper.

termination, defendant filed a written request, under the Bullard-Plawecki Employee Right to Know Act, MCL 423.501 et seq., to receive a copy of his personnel file. On January 20, 2005, plaintiff received a copy of his file, but alleged that a copy of his employment application, containing the notice of the shortened period of limitations for filing claims, was not contained within his personnel file. After his discharge, plaintiff retained counsel who sent a letter to defendant dated March 14, 2005. This [*3] letter, written by plaintiff's counsel, advised defendant that he was authorized to file suit alleging a violation of the Elliot-Larsen Civil Rights Act, MCL 37.2101 et seq, unless the parties resolved the matter by April 1, 2005.

On January 31, 2006, plaintiff filed a complaint alleging that his discharge was a result of age discrimination by defendant. Defendant moved for summary disposition, alleging that the statute of limitations had expired based on the one-year provision contained in the employment application. Plaintiff alleged that there was a split of authority regarding the application of contractual periods of limitation that reduced the statutory period of limitations. It was also asserted that the case law cited by defendant was distinguishable. However, plaintiff alleged that the contractual period of limitations should not been enforced against him when defendant failed to provide him with copies of his employment application when he requested copies of his personnel file.

The trial court denied the motion for summary disposition, concluding that the contrary positions regarding the furnishing of the employment application required [*4] him to hold an evidentiary hearing. The parties did not object to the trial court's proposed course of action. At the evidentiary hearing, plaintiff and his wife testified that they went through the personnel file and did not see the employment application. However, plaintiff testified that he did fill out and sign the employment application. Plaintiff testified that he gave the copy of his personnel file to his attorney. [2] Defendant's representative testified that 181 pages were presented to plaintiff, and the employment application could be found at page twenty-two of the materials submitted to plaintiff. The trial court reviewed the personnel file and held that the testimony presented by defendant was credible, [3] upheld the one-year period of limitation contained in the employment application, and granted defendant's motion for summary disposition.

[*5] Plaintiff first alleges that defendant had an obligation to provide plaintiff with a copy of his employment application. We hold that this issue is without merit. Although appellate review of summary disposition decisions is de novo, In re Capuzzi Estate, 470 Mich. 399, 402; 684 NW2d 677 (2004), the trial court conducted an evidentiary hearing regarding the receipt of a copy of the employment application. The clear error standard presents the appropriate scope of review when the parties challenge the trial court's factual findings. See Coblentz v City of Novi, 475 Mich. 558, 568; 719 N.W.2d 73 (2006).

We note that plaintiff's complaint raises a claim based on age discrimination. Plaintiff did not raise any claim based on the employee right to know act and did not seek to amend the complaint to allege such a violation. Following the testimony from four witnesses at the evidentiary hearing, the trial court expressly

---

[2] Plaintiff testified that he did not receive a copy of his employment application in his earlier request for his personnel file when he was advised that he would be released because of lack of work.

[3] The trial court did not conclude that the testimony presented by plaintiffs was incredible. Rather, it was opined that they probably did not see the application in the file.

held that defendant fulfilled its obligation to provide a copy of the employment application. We cannot conclude that this finding was clearly erroneous. *Coblentz, supra*. Moreover, plaintiff [*6] acknowledged at the evidentiary hearing that he was presented with the employment application and signed the application. Accordingly, this challenge is without merit.

Plaintiff next alleges that the production of plaintiff's job application presented a question of fact for the trier of fact, and the trial court erred in holding an evidentiary hearing. We disagree. In the lower court record, plaintiff never objected to the trial court's determination that an evidentiary hearing would be held. However, after a ruling adverse to plaintiff, it is now asserted that the procedural course of action taken was erroneous. Plaintiff may not harbor error as an appellate parachute. *In re Gazella*, 264 Mich. App. 668, 679; 692 N.W.2d 708 (2005). That is, counsel may not assent to a course of action in the lower court and assign error to the action on appeal. *Marshall Lasser, PC v George*, 252 Mich. App. 104, 109; 651 N.W.2d 158 (2002).

In any event, we note that plaintiff did not raise a claim in the complaint challenging the Bullard-Plawecki Employee Right to Know Act. Rather, plaintiff raised a claim based on age discrimination. At [*7] the evidentiary hearing, plaintiff acknowledged that he signed the employment application. The fact that he may or may not have received a copy of the agreement to which he was a party is not relevant to the statute of limitations claim for age discrimination. Accordingly, this challenge is without merit.

Lastly, plaintiff acknowledges that an unambiguous contractual provision shortening the period of limitations must be enforced as written. *Rory v Continental Ins Co*, 473 Mich. 457, 470; 703 N.W.2d 23 (2005); *Clark v DaimlerChrysler Corp*, 268 Mich. 138, 143; 706 N.W.2d 471 (2005). Plaintiff alleges that an exception to the general rule applies because the failure to provide a copy of the employment application to plaintiff was unconscionable. However, plaintiff failed to meet the procedural and substantive criteria to establish unconscionability. *Clark, supra* at 143-144. Moreover, plaintiff acknowledged the receipt of the form and his signature on the form. One who signs a contract is presumed to have read it, and when enforcement is sought, may not allege that he did not read it or that it was different [*8] in its terms. *Wilkie v Auto-Owners Ins Co*, 469 Mich. 41, 59; 664 N.W.2d 776 (2003). Therefore, the key issue is not whether plaintiff received a copy of the application, but his acknowledgement of its receipt and signature on the document. Accordingly, plaintiff cannot challenge the contract's terms regardless of the existence and presentation of a copy to him.

Affirmed.

/s/ Karen M. Fort Hood

/s/ Michael J. Talbot

/s/ Deborah A. Servitto



ℹ️ Cited
As of: September 1, 2016 11:12 AM EDT

## VERDICHIZZI v. WRIGHT & FILIPPIS, INC.

Court of Appeals of Michigan

November 10, 2005, Decided

No. 261680

**Reporter**
2005 Mich. App. LEXIS 2786; 2005 WL 3018394

JOHN VERDICHIZZI, Plaintiff-Appellant, v WRIGHT & FILIPPIS, INC., DARYL SULLIVAN, KAREN KIMBERLY, TIM HATT, and TOM HOPKINS, Defendants-Appellees.

**Notice:** [*1] THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Prior History:** Oakland Circuit Court. LC No. 2004-060697-NO.

**Disposition:** Affirmed.

## Core Terms

statute of limitations, argues

**Judges:** Before: Fort Hood, P.J., and White and O'Connell, JJ.

## Opinion

PER CURIAM.

Plaintiff appeals as of right an order granting summary disposition in favor of defendants. We affirm.

Plaintiff first argues that the language of the application for employment with Wright and Filippis was unenforceable and that the shortened statute of limitations period effectively prevented him from bringing his cause of action. We disagree.

A motion for summary disposition pursuant to MCR 2.116(C)(7) is appropriate where "the claim is barred because of . . . statute of limitations." MCR 2.116(C)(7). Where no factual or legal disputes exist and reasonable minds cannot differ on the law regarding the facts, the decision regarding whether a plaintiff's claim is barred by the statute of limitations is a question of law that this Court reviews de novo. *Geralds v Munson Healthcare*, 259 Mich. App. 225, 230; 673 N.W.2d 792 (2003). [*2] The interpretation of contractual language is an issue of law that is reviewed de novo on appeal. *Morley v Auto Club of Michigan*, 458 Mich. 459, 465; 581 N.W.2d 237 (1998).

Plaintiff argues that the nine-point font made the statement limiting the statute of limitations difficult to read and minimized its importance. "Written contracts are not to be held void merely because of detail or complexity of their content, or because of the type, or form of composition in which they are printed." *H H King Flour Mills Co v Bay City Baking Co*, 240 Mich 79, 83; 214 NW 973 (1927). Further, the size of the font was the same as the rest of the employment application, and the statement about the statute of limitations was in bold and capitalized, and located directly above the

signature line. Therefore, plaintiff's argument regarding font size is without merit.

Further, plaintiff argues that the language used in the application binds only plaintiff and that there was inadequate consideration from Wright and Filippis. The relevant portion of the employment application states:

> In consideration of Wright & Filippis' review of [*3] my application, **I agree that any claim, action or lawsuit arising out of my employment with, or my application for employment with, Wright & Filippis or any of its subsidiaries, including, but not limited to, claims arising under any State or Federal civil rights statutes, must be brought within six (6) months of the event or employment action that is the subject of the claim, action or lawsuit**. While I understand that the statute of limitations for claims arising out of an employment action may be longer than six (6) months, I agree to be bound by the six (6) month period of limitations set forth herein, and **I WAIVE ANY STATUTE OF LIMITATIONS TO THE CONTRARY**.

> DO NOT SIGN UNTIL YOU HAVE READ THE ABOVE APPLICANT STATEMENT.

Based on the express terms of the application, the consideration for the applicant waiving the statute of limitations in favor of Wright and Filippis' six-month statute of limitations is Wright and Filippis' consideration of the application. Plaintiff alleges that the consideration ended with his hiring because the application remains current for only thirty days if the applicant was not hired. This argument was rejected in *Timko v Oakwood Custom Coating, Inc*, 244 Mich. App. 234, 244; [*4] 625 N.W.2d 101 (2001). The terms of an employment application constitute part of the employee and employer's contract of employment because the employer provides consideration to support enforcement of the

terms of the application by providing employment and wages. See *Timko, supra*. Therefore, the statute of limitations provision was enforceable against plaintiff during the application period and after he was hired.

Plaintiff next argues that the trial court erred in failing to rule that the six-month limitation period is unreasonable. "Judicial determinations of 'reasonableness' are an invalid basis upon which to refuse to enforce unambiguous contractual provisions." *Rory v Continental Ins Co*, 473 Mich. 457, 491; 703 N.W.2d 23 (2005). [1] [*5] Accordingly, this claim of error is without merit. [2]

Plaintiff next argues that if the defamation [3]

_____

[1] Although the *Rory* Court addressed contractual language found in an insurance policy, this Court recently applied the *Rory* principles to an employment agreement in *Clark v Daimler Chrysler Corp*, __ Mich App __; __ NW2d __ (2005)(Docket No. 252765) slip op p 2.

[2] We note that plaintiff alleged that his cause of action was abrogated because the shortened time period expired before he had the opportunity to investigate and file an action. Although plaintiff alleged that he did not know the reason for his discharge until his unemployment hearing was completed, documentation completed to protest his denial of benefits indicated the contrary. Moreover, plaintiff was sent documentation the day after termination indicating that he was terminated because of threatening statements made to co-workers. Under the circumstances, plaintiff failed to establish that he did not have adequate time to investigate his claims and file within the six-month contractual period.

[3] Plaintiff also alleged that the contract period abrogated his cause of action because he did not have ample opportunity to investigate his claim and the claim did not accrue until the unemployment hearing was completed. This contention is without merit. A defamation claim

2005 Mich. App. LEXIS 2786, *5

occurred, it would not have been within the scope of his employment and therefore the language of the statute of limitations would not apply. We disagree. The language in question on the employment application reads, "I agree that any claim, action or lawsuit arising out of my employment with, or my application for employment with, Wright & Filippis. [*6] . . ."

> Well-settled principles of contract interpretation require one to first look to a contract's plain language. If the plain language is clear, there can be only one reasonable interpretation of its meaning and, therefore, only one meaning the parties could reasonably expect to apply. If the language is ambiguous, long standing principles of contract law require that the ambiguous provision be construed against the drafter. [*Singer v American States Ins*, 245 Mich. App. 370, 381 n 8; 631 N.W.2d 34 (2002).]

Here, the clear language of the contract provision does not indicate that the claim must arise out of actions within the scope of employment, but rather, the claim must arise out of plaintiff's employment with Wright. Here, the disputed statements were directed at the company in the workplace during business hours, the statements were reported to management at Wright by a concerned employee in accordance with company policy, and plaintiff's employment was terminated as a result of those statements. Based on the plain contract language, the claim arises out of plaintiff's employment with Wright. *Singer, supra.* [*7] [4]

---

accrues at the time of publication, regardless of whether the defamed individual is aware of the publication. *Hawkins v Justin*, 109 Mich. App. 743, 746; 311 N.W.2d 465 (1981).

[4] While plaintiff made additional arguments at oral argument, they were not raised or argued as issues in his brief, and we therefore do not

Affirmed.

/s/ Karen M. Fort Hood

/s/ Helene N. White

/s/ Peter D. O'Connell

---

address them.

**End of Document**